# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: READY-MIXED CONCRETE | ) | Master Docket No. |
| ANTITRUST LITIGATION | ) | 1:05-cv-00979-SEB-JMS |
| | ) | |
| | ) | |
| _____ | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

## DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF
## MOTION TO STRIKE PLAINTIFFS' OCTOBER 8, 2008 FILINGS

G. Daniel Kelley, Jr., Attorney No.5126-49
Lead Attorney for IMI Defendants

**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN  46282
(317) 236-2100

Judy L. Woods, Attorney No. 11705-49
Lead Attorney for Defendants
Builder's Concrete & Supply, Inc.
Gus B. ("Butch") Nuckols, III, and
John L. Blatzheim

**BOSE McKINNEY & EVANS LLP**
101 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5000

Edward W. Harris
Lead Attorney for Defendant
Beaver Materials Corporation

**TAFT STETTINIUS & HOLLISTER LLP**
One Indiana Square, Suite 3500
Indianapolis, IN  46204
(317) 713-3500

# TABLE OF CONTENTS

**Page**

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.  Factual  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Expert Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Order – March 10, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Order – November 8, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
Discovery "As Of July 13, 2007" . . . . . . . . . . . . . . . . . . . . . . . .   7
Daubert Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

III. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

A.   Plaintiffs' Class Reply Does Not Include The *Daubert* Response
     In Violation Of June 20, 2008 Scheduling Order . . . . . . . . . .   11

B.   The Rausser Report And Beyer Reply Violate The Court's
     March 10, 2007 And June 20, 2008 Scheduling Orders For Expert
     Disclosures And Should Be Stricken . . . . . . . . . . . . . . . . . . . .   12

     1.   The Court Has Routinely Stricken Improper Expert
          Replies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

     2.   The Rausser Report Should Be Stricken For Violating
          The Court's March 10, 2007 And June  20, 2008 Orders   16

     3.   The Beyer "Reply" Should Be Stricken – It Violates
          The Court's March 10, 2007 And June 20, 2008 Orders
          And Contradicts His Deposition Testimony . . . . . . . . .   22

          a.   Dr. Beyer's New Report Is Not Responsive To
               The *Daubert* Challenge But An Attempt To Cure
               His Failure To Employ The Scientific Method   22

          b.   Dr. Beyer's New Discussion Regarding Price
               Premiums Contradicts His Deposition
               Testimony And Should Be Stricken . . . . . . . .   28

C.   The Class Reply And *Daubert* Response Are So Replete With
     Improper Expert Testimony That They, Too, Should Be Stricken   31

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: READY-MIXED CONCRETE | ) | Master Docket No. |
| ANTITRUST LITIGATION | ) | 1:05-cv-00979-SEB-JMS |
| | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

## DEFENDANTS'[1] JOINT MEMORANDUM IN SUPPORT OF JOINT MOTION TO STRIKE PLAINTIFFS' OCTOBER 8, 2008 FILINGS

### I.    Introduction

All but admitting the scientific and intellectual bankruptcy of Dr. Beyer's initial report, plaintiffs hired in early May 2008 a new expert, Dr. Gordon Rausser (and at about the same time plaintiffs submitted a proposed order for further time eliminating *sub silentio* the Court's language limiting any further expert responses to *Daubert* issues).[2]   Plaintiffs attempt a complete, belated "start-over" with Dr. Rausser's report — now attempting many econometric/empirical analyses that Dr. Beyer failed to do — and a new 157 page Beyer Report Append. B–G which not only goes far, far beyond any *Daubert* issue, but attempts econometric cointegration analyses through at least two new, undisclosed expert econometricians using Beyer

---

[1] The defendants are the IMI Defendants, The Builder's Defendants and the Beaver Defendants.

[2] It would appear that plaintiffs have been planning since at least late April after receiving the defendants' *Daubert* motions to start-over with a new expert — hence, the requested 90 days on May 8th with a proposed order without the limitation of expert replies to *Daubert* issues. (*See* the proposed order plaintiffs tendered – Ex. 1 to Motion to Strike).

as a "mouth piece", contrary to Seventh Circuit case law.  As in prior cases, however,[3] this Court should not accept the deliberate defiance of its orders as embodied in these untimely, "sandbagging" new expert reports.  If allowed to stand, plaintiffs' actions portend substantial delay as defendants' experts must analyze entirely new theories, testing and opinions, complete with new rounds of expert document production and depositions.  All this could take up to four months and several million dollars of further costs.[4]  The untimely and new Rausser Report, Beyer Reply and plaintiffs' briefing based on them (all presenting new matter not limited to *Daubert* issues) should be stricken and class certification proceedings should go forward on the present schedule.[5]

With their October 8, 2008 filings,[6] and 95 pages of briefing, plaintiffs have deliberately violated this Court's orders, including:

1.     The Court's March 10, 2007 scheduling order required plaintiffs' motion for class

certification to be filed by August 1, 2007 and directed that "plaintiffs shall also

---

[3] *See, e.g., Allgood v. General Motors Corp.*, 2007 WL 647496 (S.D. Ind. 2007) and *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332 (S.D. Ind. 2005) and *infra* pp. 12-14.

[4] *See* Motion to Strike, ¶ 7.

[5] The defendants are filing herewith their Joint Motion to Stay Class Certification Proceedings pending the Court's ruling on the Motion to Strike.  If the Motion to Strike is granted, defendants will be spared the significant time and expense associated with expert analysis of the Rausser Report and the Beyer Reply.  In the event that the Motion to Strike is denied, defendants are also filing herewith their Conditional Motion for Modification of the June 20, 2008 scheduling order to allow for a fair and thorough examination of the new expert materials presented by plaintiffs.

[6] The "October 8, 2008 Filings" are:  (1) Plaintiffs' Consolidated Reply in Support of Motion for Class Certification (Doc. No. 671), the "Class Reply"); (2) Plaintiffs' Consolidated Response in Opposition to Defendants' Motions to Exclude the Expert Testimony of Dr. John C. Beyer, Ph.D. (Doc. No. 674, the "*Daubert* Response"); (3) the Reply Declaration of John C. Beyer, Ph.D. (Ex. 38 to Doc. No. 674, the "Beyer Reply"); and (4) the Declaration of Gordon Rausser, Ph.D. (Ex. 39 to Doc. No. 674, the "Rausser Report").

- 2 -

file supporting materials on that date, *including expert disclosures and reports,* to the extent possible in light of defendants' discovery responses as of July 13, 2007." [Doc. No. 283 (emphasis added)]. The Rausser Report and Beyer Reply are over a year late under terms of this order.

2.  The Court's June 20, 2008 Entry on Motion to Extend Deadline and Status of Expert Production Issues stated: "Plaintiffs shall file their reply in support of class certification *which shall include their response to any Daubert challenges* on or before October 6, 2008. *Any additional expert testimony filed in support is limited to the issues raised in the Daubert challenge."* [Doc. No. 617 (emphasis added)]. Plaintiffs' Class Reply does not "include" their *Daubert* response, which plaintiffs filed as a separate 35 page brief. The Rausser Report is almost entirely new econometric analyses and the 157 page Beyer Reply Report (Append. B-G) is also not limited to *Daubert* issues, attempting econometric analysis by serving as a mouth piece for other experts.

3.  The Court's October 8, 2008 order granting leave to plaintiffs "to file a Combined Reply . . . not to exceed 60 pages." (Doc. No. 670). Plaintiffs' briefing is 35 pages over-length.

## II.  **Factual And Procedural Background**

**Expert Disclosures.**    Fed.R.Civ.P. 26(a)(2) requires timely disclosures of expert testimony, including the expert's identity and "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the data or other information considered by the witness in forming them. . . ." Failure to comply with these disclosure requirements subjects a party to the sanctions described in Fed.R.Civ.P. 37(c)(1), including a prohibition against use of

undisclosed information in connection with a motion.[7]  These provisions were added to the rules in 1993 specifically to end the practice of providing expert disclosures "so sketchy and vague" as to frustrate the opposing party's work in response.  28 U.S.C.A. 1993 Advisory Committee Note to Fed.R.Civ.P. 26, p. 479 (2008).

The Advisory Committee Notes emphasized that "in most cases the party with the burden of proof on a issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue."  *Id.*  Rule 37's exclusion sanction "provide[s] parties with an incentive to timely disclose all material evidence in support of their positions that they intend to use at any point during the course of the litigation, thus attacking the temptation some parties might feel to try to gain a tactical advantage at trial by exposing for the first time at that stage evidence that is favorable to their position."  7 *Moore's Federal Practice (3d)* § 37.60[1], p. 37-124 (2007).

**Order – March 10, 2007.**  With these requirements in mind, the parties here carefully negotiated a Case Management Plan for class certification proceedings and expert disclosure requirements to prevent the "sandbagging" tactic of presenting new evidence and arguments for the first time in reply.[8]  The language negotiated by the parties was approved by the Court and appears in the Court's March 10, 2007 Order establishing the deadline for plaintiffs' expert

---

[7] Rule 37(c)(1) provides, in pertinent part:  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The requirements of Rule 26(a)(2), and the corresponding sanction of Rule 37(c)(1), are typically enforced by a motion to strike or otherwise to exclude evidence.  7 *Moore's Federal Practice (3d)*, § 37.60[2][a], p. 37-125 (2007).

[8] Fed.R.Civ.P. 26(a)(2)(C) provides that the default time to disclose expert testimony may be modified by "stipulation or a court order. . . ."  The disclosure schedule and requirements agreed to by the parties constitute such a stipulation, which has been approved by the Court in a succession of case management orders described below.

- 4 -

disclosures in connection with their Motion for Class Certification.  This Order provides, in pertinent part:

> Plaintiffs shall file their Motion for Class Certification and supporting Brief on or before **August 1, 2007**.  Plaintiffs shall also file supporting materials on that date, including expert disclosures and reports, to the extent possible in light of defendants' discovery responses as of July 13, 2007.[9]

The Court's Order is perfectly clear that any new expert disclosures plaintiffs wish to make after August 1, 2007 must be based on defendants' discovery responses served *after* July 13, 2007.  At the status conference on November 5, 2007, counsel for the defendants again expressed the concern that Dr. Beyer would attempt to present new arguments for the first time in reply in an effort to thwart full analysis of his opinions by defendants' experts.

**Order – November 8, 2007.**  In its November 8, 2007 Entry on Defendants' Joint Motion for Clarification of Case Management Order for Dates Certain for *Daubert* Motions (Doc. No. 454), the Court recognized defendants' concern and modified the Case Management Order to address it ("Concerns about never-ending or ever-changing expert opinions were also raised.  An appropriate briefing schedule was addressed").[10]

In response, the Court deleted from the Case Management Order any opportunity to exchange additional expert reports sixty days prior to a class certification hearing and added new language to the Order limiting any further expert submission by plaintiffs.  The Court concluded:

> "The current [case management] plan provides for certain scheduling of expert disclosures during the certification briefing process, but then contemplates additional expert disclosures as any hearing on the certification approaches.  Now that the issues to be

---

[9] Order Enlarging Class Certification Briefing Schedule dated March 10, 2007 (Docket No. 283).

[10] *See* Entry on Defendants' Motion to Compel, Motion for Amendment to the Court's Case Management Plan, and Motion for Clarification of Case Management Order for Dates Certain for *Daubert* Motions (Doc. No. 454, p. 6.)

> presented on the issue of certification have been elucidated more fully, the magistrate judge finds the current schedule to be cumbersome, potentially duplicative, and protracted."[11]

As modified by the November 8, 2007 Entry, the Case Management Order stated:

> "Plaintiffs shall file their reply in support of class certification which shall include their response to any *Daubert* challenges on or before May 15, 2008. Any additional expert testimony filed in support is limited to the issues raised in the *Daubert* challenge." [November 8, 2007 Entry, p. 7].

This new language was consistent with the Court's verbal admonition at the November 5, 2007 hearing to the effect that plaintiffs would need to live with Dr. Beyer's July 30, 2007 report.[12]

Plainly dissatisfied with this limitation (and, as it turns out, having just hired Dr. Rausser), plaintiffs endeavored to delete it in the proposed order tendered with their May 1, 2008 motion to extend the class certification briefing schedule (*see* Doc. No. 570-1). This proposed order stated "Plaintiffs shall file their reply in support of class certification and response to defendants' *Daubert* challenges on or before October 6, 2008" and *deleted* the existing requirement that: "Any additional expert testimony filed in support is limited to the issues raised in the *Daubert* challenge", which appeared in the February 19, 2008 scheduling order then in effect. [*Compare* plaintiffs' proposed order tendered with Docket No. 570, ¶ A (Ex. 1 to Defendants' Joint Motion to Strike) *with* Paragraph 3 of the Order Entry dated February 19, 2008 (Doc. No. 534).] For whatever reason, nothing was said about this deletion in the accompanying motion for an extension of time. But plaintiffs' effort failed when the June 20, 2008 Entry on Motion to Extend Deadline and Status of Expert Production Issues (Doc. No. 617) again repeated

---

[11] *Id.* at p. 6.

[12] Counsel for the defendants has been informed by the Court's courtroom deputy that no transcript was prepared of the November 5, 2007 hearing. Counsel's recollection of the Court's statement to plaintiffs is "You've had your shot" with Dr. Beyer's July 30, 2007 report.

the limiting language: "Any additional expert testimony filed in support is limited to the issues raised in the *Daubert* challenge." [June 20, 2008 Entry, p. 10, ¶ 1. (Doc. No. 617)]. The reason for plaintiffs' dissatisfaction with this limiting language is now evident: at the time plaintiffs were trying to remove this requirement, they had hired a new expert – Dr. Rausser[13] to "do over" plaintiffs' whole case. Plaintiffs tried in a surreptitious manner to grant themselves leave to submit new expert reports when they proposed changing the Court's February 19, 2008 Order Entry (Doc. No. 534), and having failed to obtain leave of Court to submit new experts, went ahead and did so anyway.

**Discovery "As Of July 13, 2007".** The March 10, 2007 scheduling order (Doc. No. 283) required plaintiffs to make expert disclosures on August 1, 2007 "to the extent possible in light of defendants' discovery responses as of July 13, 2007." Plaintiffs already had the material electronic transaction and other data used in the Rausser Report and Beyer Reply at that time. As memorialized in IMI defense counsel's December 18, 2006 correspondence with plaintiffs' counsel, plaintiffs were to request specific data fields from the Command Alkon system, whereupon "the parties will discuss in good faith the specifics of what information is to be produced. That information will then be exported, without modification except as to format, from the [Command Alkon] databases on to a disk or other such medium for delivery to counsel for all other parties."

Thereafter, by correspondence dated February 23, 2007, plaintiffs' counsel requested from IMI and BCS over 4,000 sales transaction data fields from defendants' Command Alkon systems. The IMI and BCS defendants agreed to produce without objection all of the data from

---

[13] *See, supra* at n. 2 and accompanying text.

- 7 -

their respective Command Alkon systems requested by plaintiffs.[14]   On May 18, 2007, long before the July 13, 2007 trigger-date established in the March 10, 2007 scheduling order, the IMI and BCS defendants produced the sales transaction data requested by plaintiffs, which amounted to eleven gigabytes of data from IMI's and BCS's Command Alkon systems.

The Prairie, Shelby and American defendants also produced their sales transaction data as requested by plaintiffs prior to July 13, 2007.  Prairie's sales transaction database from its SAP and COMADS systems was produced on May 21, 2007 on two compact disks bearing Bates Nos. PMSI 162-63.  Shelby's Systech transaction database was produced on September 14, 2006. American's Jonel transaction database was produced on January 24, 2007.  Dr. Beyer's July 30, 2007 report acknowledges making use of the IMI, BCS, Prairie, Shelby and American electronic transaction data and hence its availability to him at that time.[15]   Dr. Rausser likewise acknowledges:  "For much of my analysis I utilized transaction data supplied by the defendants. In addition I utilized a dataset containing a processed version of the transaction databases prepared by Nathan Associates."[16]

---

[14] This production is reflected in the IMI and BCS defendants' Report Regarding Production of Electronic Data Fields, filed March 19, 2007, in which IMI and BCS stated that they "do not object to production of data in the [Command Alkon] fields requested by plaintiffs on February 23, 2007 correspondence."   [Doc. No. 286]   Thereafter, in their response to Defendants' Report to the Court Concerning Production of Requested Electronic Data Fields, plaintiffs acknowledged "that defendants did not object to any of the requested data fields." [Doc. No. 302]

[15] *See* July 30, 2007 Beyer Declaration, pp. 3 & n. 5 and B-3.  Dr. Beyer stated that he relied in his initial report on "Electronic databases containing ready-mixed concrete transaction data produced by defendants IMI, Prairie, Shelby, Builder's and American. . . .  The following are the time periods for which defendants provided electronic data regarding ready-mixed concrete transactions:  IMI – December 1999 to May 2005, Prairie – July 1999 to December 2005, Shelby – January 2000 to May 2005, Builder's – July 1999 to May 2005, American – February 2003 to October 2005. . . . " *Id.* at p. 3 & n. 5.

[16] Rausser Report, ¶ 7.

- 8 -

Likewise, and long before July 13, 2007, IMI, BSC, Prairie and Shelby produced invoices and bid documents which readily revealed the payment terms on each invoice, such as an early-paid discount, if offered, or late-paid charges in some transactions.  In fact, Dr. Beyer said in his Report that he reviewed IMI documents (p. B-5) which included each and every invoice to each plaintiff and the entire invoice register clearly showing invoice prices and any payment terms, such as an early pay discount, if applicable.  *See* CIVLIT 000000001-0003330236.  Indeed, plaintiffs' own documents and each plaintiff's deposition testimony revealed the same payment terms applicable to some invoices, as well as the importance of credit to the selection of the concrete supplier.[17]  Now, in "reply", plaintiffs attempt to obscure the fact that IMI's and Builder's invoice prices were substantially higher than the invoice prices of Prairie and Shelby.

---

[17] *See* Salazar (named plaintiff T&R Contractor) Dep. 72-89, 137-42 and Ex. 26 and 27, on the importance of credit to contractors and whether contractors take advantage of early pay discounts; *see also* Toth (named plaintiff Cherokee Development) Dep 47, and Dan Grote (named plaintiff) Dep. 47.

Filed herewith as Exhibit 2 are copies of invoices and billing statements from various competitors for sales of ready mix concrete to various named plaintiffs.  The documents were produced by the plaintiffs. Among other things the documents show:

- Shelby, like IMI and Builders (*see* fn. 45), did not always offer an early pay discount as part of its payment terms.  Boyle0000385 does not offer an early pay discount from the invoice price,.  Cherokee0000094 does.
- When one is offered, IMI clearly discloses the availability of an early pay discount as a payment "term."  Boyle 0000367 and 463.
- Customers do not take advantage of an early pay discount just because one is offered.  Marmax 0000306 is a billing statement produced by named plaintiff Marmax Construction.  Although the original invoices reflected on that statement had an available early pay discount (*see* Marmax0000405, 417, and 418), the discount is no longer available because of late payment.  *See also supra* regarding named plaintiff T&R Contractor.

For its part IMI produced its copies of invoices long before July 2007 and those reflected any available payment terms.  Thus, Dr. Beyer's surmise at this late date that the "price" includes early pay discounts is simply wrong.

- 9 -

I/2240364.5

Plaintiffs do so by literally changing the invoice price (by assuming that an early-pay discount was offered to and taken by all purchasers, which is not true) subtracting an amount from some invoice prices or by adding any amount to other invoice prices – and simply ignoring other payment terms and more generally the subject of credit. Under the plain terms of the March 10, 2007 order, then, there is no excuse for plaintiffs' and their expert's newfound "early-pay" charade and Dr. Rausser's do-over.

***Daubert* Issues:** IMI's *Daubert* challenge to Dr. Beyer is that he failed apply generally accepted principles and methods in the science of economics in reaching the conclusions in his report. (*See* Memorandum in Opposition to Class Certification, pp. 4-15) The most glaring of these deficiencies is that Dr. Beyer failed to do *any* empirical study, such as correlation or cointegration testing, to confirm or reject his assertions, which is critical in any economic analysis. Rather, Dr. Beyer's report contained nothing but a statement of his theory for why he thought proof of common impact should be possible given his investigation of the industry. He did not test any of the underpinnings of his theory with the available transaction data, which IMI's experts agreed (and now Dr. Rausser agrees) is necessary before an opinion can rise to the level of "science."[18] Hausman Rept. ¶¶ 7-16; Umbeck Rept. 3-4; *see* IMI's *Daubert* Motion

---

[18] Plaintiffs repeatedly misrepresent the roles of Drs. Hausman (MIT) and Umbeck (Purdue). Both were hired to evaluate whether Dr. Beyer's applied generally accepted principles and methods in economics. Neither was charged with doing a separate substantive analysis. As Dr. Umbeck stated succinctly in his report:

> Specifically, I have been asked to critique the Declaration of Dr. Beyer to determine whether he has employed generally accepted principles and methods of economics to reach his conclusions and whether he has used these methods to reliably analyze facts relevant to the issue of class certification.

(Umbeck Rept. 2; *see* Hausman Rept. ¶ 6.) Thus, when Dr. Beyer states, for example, "Dr. Umbeck's Analysis of Non-defendant Suppliers Was Unscientific, Incomplete, and Flawed," (Beyer Reply, p. 25) he is misstating the nature of Dr. Umbeck's testimony.

- 10 -

(Doc. 550) and Memorandum in Opposition to Class Certification, pp. 4-5 (Doc. 551). What Beyer claimed was an "empirical" test – namely, visual inspection of indexed price data to conclude that prices move together – is not an empirical test but rather, by Dr. Beyer's own admission, a subjective test. It is not accepted science (as Dr. Rausser agrees).[19]

Equally, it turned out that Dr. Beyer "cooked" the invoice price data to make it appear that the invoice prices of IMI, Builder's, Shelby and Prairie were moving together (under his "eyeball test") – which he did by using three month moving averages to smooth out the line, (smooth out the differences among the data points) and then used indexing in order to move the four invoice price lines closer together. Beyer also testified that he used these average price lines to determine the "absence of any persistent price premium" by any supplier.[20] When Dr. Umbeck simply removed the indexing from Beyer's charts, leaving Beyer's three month moving average prices, Beyer's four invoice price lines separated dramatically, revealing the significant differences among the invoice prices which Beyer was using for Builder's and IMI as compared to those for Shelby or Prairie and further revealing that Beyer's invoice price lines did not move together. Having been caught in this subterfuge, Beyer now says that Dr. Umbeck shouldn't have used *Dr. Beyer's own charts and invoice prices*.

III. **Argument**

   A. **Plaintiffs' Class Reply Does Not Include The *Daubert* Response In Violation Of June 20, 2008 Scheduling Order.**

The June 20, 2008 Entry on Motion to Extend Deadline and Status of Expert Production Issues (Doc. No. 617) requires that "Plaintiffs shall file their reply in support of class

---

[19] Even plaintiffs new expert, Dr. Rausser agrees that visual inspection is not such a test. (Rausser Report, ¶ 20.)

[20] Beyer Dep. 146-52.

I/2240364.5

certification *which shall include their response to any Daubert challenges* on or before October 6, 2008." [Emphasis added]. In its October 6, 2008 Order Granting Plaintiffs Leave to File Brief in Excess of Page Limit (Doc. No. 670) the Court granted plaintiffs leave to file a "Combined" 60 page Class Reply.

Contrary to these orders, on October 8, 2008 plaintiffs filed *both* a 60 page Class Reply and a separate 35 page *Daubert* Response. The 60 page Class Reply did not "include [plaintiffs'] response to any *Daubert* challenges. . . ." Evidently dissatisfied with the Court's October 6, 2008 Order allowing a 60 page limit, plaintiffs simply granted themselves an additional 35 page extension by ignoring the Court's Order that the Class Reply "include" plaintiffs' response to the *Daubert* motion. Plaintiffs have deliberately flouted the Court's June 20, 2008 and October 6, 2008 orders governing briefing. As a sanction, the 35 page *Daubert* Response should be stricken in its entirety because it was (i) not included in the Class Reply and (ii) 35 pages in excess of the 60 page limit.

**B.**     **The Rausser Report And Beyer Reply Violate The Court's March 10, 2007 And June 20, 2008 Scheduling Orders For Expert Disclosures And Should Be Stricken.**

       **1.**     **This Court Has Routinely Stricken Improper Expert Replies.**

This Court has not hesitated to strike untimely, "sandbagging" expert replies. [21] In *Allgood v. General Motors Corp.*, 2007 WL 647496 (S.D. Ind. 2007), this Court applied the

---

[21] It is elementary that "arguments raised for the first time in a reply brief are waived." *Wesleyan Pension Fund Inc. v. First Albany Corp.*, 964 F.Supp. 1255, 1275 (S.D. Ind. 1997); *Hall v. Cropmate*, 887 F.Supp. 1193, 1199 (S.D. Ind. 1995) ("It is well established that new arguments may not be first raised in a reply brief – a party must state all of its reasons in support of a motion the first time around"). This principle alone would require striking of plaintiffs' reply materials, including the new transaction-data charts, arguments concerning an "early pay" discount and its purported effect on price premia and plaintiffs' belated attempts, through the Beyer Reply and Rausser Report, to invoke econometric techniques such as cointegration and regression analysis.

- 12 -

1993 amendments to Rules 26(a)(2) and 37(c)(1) to strike an expert report raising new arguments and opinions in reply. The Court noted that the new report "uses new methods and new data to address damages issues that plaintiffs had not addressed previously with expert testimony. Those damages issues have been in this case from the beginning. Plaintiffs bear the burden of proof on those issues." *Id.* at *1.

Citing *Beller v. United States*, 221 F.R.D. 689, 695 (D. N.M. 2003), this Court rejected any contention that the rules "give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the 'supplement' label." The Court observed:

> Although Fed.R.Civ.P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from outset).
>
> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*Allgood,* 2007 WL 647496 at *3-4 (quoting *Beller*, 221 F.R.D. at 695).

In accordance with the four part standard under Rule 37(c)(1) set forth by the Seventh Circuit to evaluate motions to exclude evidence in *David v. Caterpillar Inc.*, 324 F.3d 851, 857 (7th Cir. 2003), the *Allgood* Court looked to (1) "the prejudice or surprise to the party against whom the [new expert] evidence is offered"; (2) "the ability of the party to cure the prejudice";

- 13 -

(3) the likelihood of disruption to the trial;" and (4) "the bad faith or willfulness involved in not disclosing the evidence at an earlier date". *Allgood*, 2007 WL 647496, *5-6.[22]

The Court  noted that the defendant would be prejudiced by having to re-open expert discovery, conduct another deposition of plaintiffs' expert and have its own experts analyze the new report.  The Court emphasized that this prejudice is not cured "simply because there is time to reopen discovery."  Rather, the disruption to orderly case management occurs with the very filing of an untimely expert reply and cannot be undone other than by striking the reply.  Finally, the *Allgood* Court found the violation of Rule 26(a)(2) and the Court's scheduling order to be deliberate:  "Plaintiffs deliberately chose not to develop expert evidence on these topics at the early stages." *Id.* at *6.

This Court undertook a similar analysis in *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332 (S.D. Ind. 2005) to strike a purported "rebuttal" expert report which sought to present new arguments and opinions. *Id.* at *7-8.  This Court stated:

> Plaintiffs bear the burden of proof on the issue of damages.  If they
> intended to offer expert testimony on the subject, the applicable
> deadline was the original expert witness deadline.  Treating the
> Miller report as a proper rebuttal report would allow evasion of the
> orderly development of the case, in which plaintiffs should be
> expected to come forward first with any theory of damages and

---

[22] Earlier in *Salgado v. General Motors Corp.*, 150 F.3d 735, 742-43 (7th Cir. 1998), the Court held that no showing of bad faith or willful violation is required in order to exclude expert testimony under Rule 37(c)(1).  *See 7 Moore's Federal Practice (3d)*, § 37.60[2][b], p. 37-130 (2007) ("the Seventh Circuit has upheld a district court's order excluding essential evidence without any express finding of willfulness or bad faith.  The circuit court found that the district court did not abuse its discretion in precluding plaintiffs' expert from testifying in a product liability action for failure to comply with the Court's deadline for submission of expert witness reports. . . . The Court of Appeals also pointed out that by proffering a much more substantial report later, based on no additional discovery, plaintiffs' counsel essentially demonstrated that he had had the ability to comply all along -- but, in effect, chose not to.  While the Court of Appeals opinion clearly does not require a finding of willfulness or bad faith, such a finding could have been made on this record – a fact that probably was not lost on the appellate judges."

- 14 -

supporting expert testimony, followed by a response from defendants, and an opportunity for rebuttal.

* * *

Plaintiffs have offered no excuse at all, however, for waiting until 'rebuttal' to come forward with expert testimony supporting a damage theory. . . . [S]uch disregard of the schedule and the orderly development of the case cannot be deemed harmless because it gave the plaintiffs the opportunity to wait for defendants to show their expert cards and because indulgence of plaintiffs' tactics would contribute to further delay, expense, and complication in an already long, expensive, and complicated lawsuit. Under such circumstances, striking the report and barring Miller's testimony is an appropriate sanction. . . . Such tactics contribute to the length, complexity, and expense of litigation. They do not require the courts' indulgence.

*Nelson*, 2005 WL 1924332, at *8.

Many other courts have agreed with this Court's reasoning in *Allgood* and *Nelson*, striking expert replies that seek to present new arguments for the first time.[23]

_____

[23] *See, e.g., Cohlmia v. Ardent Health Services,* 2008 WL 3992148, *6-7 (N.D. Okla. 2008) ("A supplemental expert report that states additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceed the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)(1). . . . The supplementation plaintiffs suggest here is, in fact, a second bite at the apple – an opportunity to correct fatal defects in the reports they have submitted. That is not what Rule 26(e) envisions"); *Ullman v. Auto-Owners Mutual Insurance Co.,* 2007 WL 1057397, *4-5 (S.D. Ohio 2007) (Rule 26 "prevents experts from 'lying in wait' to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony"); *Palmer v. Asarco Inc.,* 2007 WL 2254343, *3-4 (N.D. Okla. 2007) ("The Court has reviewed Dr. Brown's new affidavit, there is no doubt that the affidavit contains new opinions, facts, and testing that were not previously disclosed. Dr. Brown's affidavit is essentially a new expert report with new opinions, defendants would need to depose Dr. Brown before trial to prepare a meaningful *Daubert* challenge or cross-examine him at trial. Dr. Brown's new affidavit presents a clear violation of Rule 26(a)(2), and the Rule was designed to prevent exactly this type of late disclosure of expert opinions"); *Galaxy Venture LLC v. Rosenblum,* 2005 WL 5988690, *4-5 (D. N.M. 2005) (striking expert's reply report that presented new arguments based on material available to the expert at the time his original report was filed); *Beller,* 221 F.R.D. at 700-02 (D. N.M. 2003) (noting that the 1993 rules amendments were designed to "eliminate the former process of 'trial by ambush' and mandate full disclosure . . . at an early stage of the proceedings." The *Beller* Court also held that "reopening discovery will not cure the problem . . . . Because Dr. Grant offers new opinions in his report, or at least

- 15 -

2.    **The Rausser Report Should Be Stricken For Violating The Court's March 10, 2007 and June 20, 2008 Orders.**

The Rausser Report violates both the March 10, 2007 and June 20, 2008 Orders.  Under the March 10, 2007 Order, Dr. Rausser's "expert disclosures and reports" were required to be made by August 1, 2007 "to the extent possible in light of defendants' discovery responses as of July 13, 2007."  Even a cursory review of the Rausser Report demonstrates that it is based largely on defendant's sales transaction and other data available to plaintiffs prior to July 13, 2007.  As Dr. Rausser acknowledges:  "For much of my analysis I utilized transaction data supplied by the defendants.  In addition I utilized a dataset containing a processed version of the transaction databases prepared by Nathan Associates."[24]

The Rausser Report also violates the Court's June 20, 2008 order because it is "additional expert testimony" which is not "limited to the issues raised in the *Daubert* challenge."  Instead, the Rausser Report quite openly presents new theories, arguments and opinions in support of plaintiffs' motion for class certification.  Indeed, in Dr. Rausser's own description of the scope of his work, he states that he was engaged to evaluate "arguments regarding whether members of the class would have experienced a common impact from the alleged price fixing, whether

---

new bases for his opinions, USA would have a right to take a new deposition of this expert.  The new deposition testimony might well lead to USA having to modify its prior reports or retain new experts to counter the opinion testimony being offered in Dr. Grant's revised report," resulting in unacceptable delay); *Adams v. Jackson*, 218 F.Supp.2d 1006, 1010 (N.D. Ind. 2002) (disapproving the "'sandbagging' aspect of Jackson having waited until his reply memorandum to provide any evidentiary support, effectively waiving the point"); *Lang v. Kansas City Power & Light Co.*, 199 F.R.D. 640, 652-53 (W.D. Mo. 2001) ("Moving parties are not allowed to wait until their reply suggestions to advance arguments and provide expert support for their positions, even if the underlying data is in the opposing party's possession").

[24] Rausser Report, ¶ 7.

I/2240364.5

common evidence can be used to establish that impact, and whether there is a workable methodology that may be used to calculate damages on a class-wide basis."[25]

To the extent that Dr. Rausser addresses the methodology of Dr. Beyer's July 30, 2007 Report at all – the sole legitimate purpose of additional expert testimony at this stage – he is largely critical of that methodology. Thus, Dr. Rausser describes as "unreliable at best" a visual inspection of price graphs in the "absence of any statistical analysis on the data underlying the graph" and a "failure to control for other possible price determinants. . . ."[26] Because Dr. Beyer's original analysis of price graphs likewise "relies entirely on visual inspection", under the reasoning of the Rausser Report Dr. Beyer's own original methodology is "unreliable at best".[27] Dr. Rausser also criticizes use of a three-month moving average price series, which Dr. Beyer did, because "[i]n using three month moving averages it is likely that he smoothed over the very price movements that he was investigating, therefore disguising any relationship."[28] Once again, Dr. Rausser's criticism applies directly to the original Beyer methodology.

Apart from its criticism of the methodology Dr. Beyer used in his original report, the Rausser Report is devoted to presenting a complete and unauthorized "do over" with respect to class certification issues based on transaction data and other evidence, available to plaintiffs

---

[25] Rausser Report, ¶ 5. Dr. Rausser further states: "My analysis has focused on the following issues: . . . b. the specific arguments made by defendants' experts in *opposition to certification* and in criticism of Beyer's analyses; c. empirical analysis related to Beyer's assertions and conclusions *regarding common impact*; and d. methods that may be used to *calculate classwide damages* and the availability of data necessary to execute them." Rausser Report, ¶ 6 (emphasis added).

[26] Rausser Report, ¶ 20.

[27] Rausser Report, ¶ 20.

[28] Rausser Report, ¶ 34.

before July 13, 2007.  Examples of the Rausser Report's focus on class certification, rather than

*Daubert,* and reliance on matters available pre-July 13, 2007, include the following:

- Dr. Rausser explicitly argues under "Conclusion #1" that "defendants' experts do not present evidence (as opposed to theory or conjecture) that rejects the propriety of class certification";[29] (¶¶ 28-37)

    - In his discussion under "Conclusion #1", critiquing the work of defendants' experts, Rausser relies entirely on published economics literature and evidentiary materials (FBI 302's) available to plaintiffs before July 13, 2007;[30]

- Dr. Rausser's arguments in support of his "Conclusion #2" are avowedly directed toward establishing that "it is possible to observe and measure the common impact upon class members of the alleged conspiracy to artificially elevate those prices," not toward defending Dr. Beyer's original methodology from the *Daubert* challenge;[31] (¶¶ 38-56)

---

[29] Rausser Report, ¶¶ 28-37.  In this section of his report, Rausser questions Dr. Marshall's conclusions with respect to price dispersion and cointegration testing, subjects which appear nowhere in Dr. Beyer's original report or defendants' *Daubert* challenges.  Indeed, Dr. Rausser once again implicitly *criticizes* Beyer's original methodology in suggesting that "visual inspection of graphs" is "an artifact of Marshall's failure to perform serious data analysis" and in criticizing Dr. Marshall's use of Beyer's own data averaging because "it is likely that he smoothed over the very price movements that he was investigating, therefore disguising any relationship." *Id.* ¶¶ 33-34.

[30] Rausser Report, ¶¶ 14-36 and notes 1-68.  Rausser cites the reports of defendants three experts, Robert Marshall, John Umbeck and Jerry Hausman, of course, but his critique of them is based entirely on published economics literature and evidentiary materials long available to plaintiffs.  This is evident from the footnotes in the Rausser Report supporting "Conclusion #1", which cite published economics literature and the FBI 302 reports produced by American on April 19, 2007, and publicly available information on county building permits.  All of this material was available to plaintiffs as of July 13, 2007.

[31] Rausser Report, ¶¶ 38-56.  Dr. Rausser presents three discrete sub-arguments in support of his Conclusion #2, none of which is even colorably related to defendants' *Daubert* challenge or to Dr. Beyer's original methodology.  First, Dr. Rausser presents a regression model to attempt to account for a certain amount of the price dispersion which he acknowledges is present in the data.  *Id.* ¶¶ 38-49.  This material plainly does not constitute a defense of Dr. Beyer's original methods for purposes of *Daubert* inasmuch as Beyer conducted no regression analysis and denied that there *was* any material price variation for which to account.  Dr. Rausser also uses regression analysis to purport to show that "a price premium does not exist" and that "relationship capital is unlikely to exist in [the ready-mixed concrete] market. . . ." *Id.* at ¶¶ 50-56.  Once again, this can hardly constitute a defense of Dr. Beyer's original methods, which presented no regression analysis and merely promised to produce such an analysis in the future, after certification was granted.

- 18 -

- Dr. Rausser's use of regression analysis to contend that "[m]ore than 60% of price variation can easily be explained by a few observable explanatory variables" is based entirely on defendant transaction data which, with the exception of the Beaver data, was available to plaintiffs, at the latest, in May 2007;[32]  (¶¶ 39-49)

- Dr. Rausser's conclusion that "a price premium does not exist: regression analysis reveals very small differences in price across defendants" is likewise based exclusively on defendant transaction data which (again, with the sole exception of Beaver) was available to plaintiffs by May 2007;[33]  (¶¶ 50-51)

- Dr. Rausser's contention that "relationship capital is unlikely to exist in this market and regression analysis revealed that old customers pay very similar prices to new customers" is also based on the defendants' transaction data available to plaintiffs by May 2007.[34]  (¶¶ 52-56)

- Dr. Rausser's "Conclusion #3" is that "common evidence can be used to establish the impact upon class members of defendants' conspiracy to fix, raise, maintain or stabilize prices of RMC", which on its face addresses the predominance requirement for class certification and bears no relation to defendants' *Daubert* challenge;[35]  (¶¶ 57-98)

---

[32] Rausser Report, ¶¶ 38-49 and notes 69-78.  Dr. Rausser's regression model rests explicitly on defendants' transaction data, as he repeatedly acknowledges.  *See* Rausser Report at ¶¶ 41 ("Defendants' transaction dataset supplied thus far is sufficient to explain more than 60% of the variation in RMC prices using just a small number of intuitively obvious variables"), 42 ("the defendants' transaction datasets can be used to measure each of these characteristics"); 43 (referencing sample delivery location descriptions from the IMI and Builder's transaction data); 44 ("additive mixtures (such as calcium or air) and other additional items sold with RMC are recorded in the transaction datasets"); 45 ("defendants' combined transaction data provides details about approximately 2,000,000 discrete deliveries occurring over a period of seven years, all of which included a recorded price"); 46 ("Table 4 shows the results of such a regression analysis investigating the effect of the seven price-drivers on the price of RMC as reported in defendants' datasets"); 48 (using defendant transaction data to conclude that the "seven identified price determinants explain 62% of the variation in price").  Once again, with the sole exception of the relatively small body of Beaver transaction data, all of this transaction data was available to plaintiff by May 2007, long before the July 13, 2007 trigger-date provided in the March 10, 2007 scheduling order.

[33] Rausser Report, ¶¶ 50-51.

[34] Rausser Report, ¶¶ 52-56.

[35] Rausser Report, ¶¶ 57-98.  Once again in this section of his report, Dr. Rausser presents all manner of arguments having no conceivable relation to defending Dr. Beyer's original methodology.  For example, Dr. Rausser presents an elaborate argument to support the

- Dr. Rausser's opinion that "RMC [ready-mixed concrete] is a homogeneous good and it is interchangeable across producers" is based on defendant transaction data, published economic literature and published government data which were available to plaintiffs by May 2007;[36] (¶¶ 57-69)

- Dr. Rausser's contention that "demand for RMC is inelastic" is based on published commodity data from the U.S. Department of Commerce ending in 2005;[37] (¶ 74)

- Dr. Rausser's argument that there is "little observed substitution between RMC and other building materials, despite movement in relative prices" is based on published industry data from the U.S. Department of Commerce and the U.S. Bureau of Labor Statistics. The former data conclude in 2005 and the latter in 2002: all were available well prior to July 13, 2007;[38] (¶ 74)

---

conclusion that price dispersion "need not hinder class certification if the differences are 'systematic and reasonably can be controlled for in any but-for analysis.'" *Id.* ¶ 60. Similarly, Dr. Rausser uses transaction data and conducts cointegration tests entirely foreign to Beyer's original methodology to argue that "price fixing behavior would have a common impact on all customers" regardless of distinct geographic markets [*id.* ¶¶ 88-95].

[36] Rausser Report, ¶¶ 57-69 and notes 82-107. *See, e.g., Id.* at ¶¶ 85 (citing U.S. Department of Labor industry classifications); 60 (using defendant transaction data to argue that the defendants' price dispersion is insufficient to prevent but-for analysis of class-wide impact); 61 (citing academic literature from 1997 through 2004 to compare price dispersion in other industries and products); 62 (citing 1997 economic literature to compare price dispersion of ready-mixed concrete with that of certain other products); 63 (presenting a table drawn from U.S. Department of Agriculture data reflecting price dispersion in wheat for purposes of comparison with ready-mixed concrete); 64 and Table 10 ("judging from defendants' own data, customers viewed the RMC product as interchangeable and routinely purchased from several producers." With the sole exception of Beaver, the transaction data appearing in Dr. Rausser's Table 10 was available to plaintiffs at the latest in May 2007); 65 (reviewing transaction data for "4,000 psi purchases for all years . . . [to] confirm customers broadly purchasing from multiple suppliers"); 66 (presenting in Table 11 an argument derived from defendants' transaction data reflecting "a proportion of all customers (as opposed to just the top 30) who purchased RMC from more than one defendant"); 67 (using transaction data from Builder's and IMI to argue that the "consistency of RMC prices also provides evidence of its homogeneity"); 69 (concluding on the basis of an IMI-Builder's data test that "defendants prices were, in fact, cointegrated").

[37] Rausser Report, ¶ 71 and Figure 4.

[38] Rausser Report, ¶¶ 74 (and Figure 5) and 76 (and Figure 6).

- 20 -

- Dr. Rausser's conclusion that "defendants had market power in the central Indiana area" is based on defendant data reflecting plant locations and U.S. Census Bureau data, each available well prior to July 13, 2007;[39] (¶ 77)

- Dr. Rausser uses average monthly prices for 4,000 psi concrete drawn from defendants' transaction data to argue that "prices in different counties are clearly related" and the "price fixing behavior would have a common impact on all customers, as long as those markets overlapped";[40] (¶ 92)

- Dr. Rausser uses defendants' transaction data to perform cointegration testing on prices before and after conspiratorial meetings;[41] (¶ 96)

- In "Conclusion #4", Dr. Rausser promises "more than one workable methodology that may be used to calculate class-wide damages", which does nothing to support Dr. Beyer's equally promissory approach for *Daubert* purposes.[42] (¶¶ 99-104)

  - Dr. Rausser concludes by flat-out admitting that "*the results reported in this declaration are largely limited to an analysis of [defendants'] initial data production*", which plaintiffs had by May 2007.[43]

---

[39] Rausser Report, ¶ 77 and Tables 12 and 13. *See also, Id.* at ¶¶ 81 (attempting to estimate variable transport cost on the basis of data from the U.S. Bureau of Labor Statistics as of 2002 (Table 14); 82 (discussing defendants' plant locations based on information from "defendants' websites" [Table 15]); 83 (arguing for defendants' market power based on an FBI 302 report and Price Irving's Beaver criminal trial testimony, both of which were available to plaintiffs long prior to July 13, 2007); 85 (attempting to calculate defendants' market share in Indianapolis based on defendants' "records for their sales in Central Indiana counties" which (except for Beaver) were produced by May 2007); 86 and Table 16 (relying on defendants' transaction datasets to calculate net sales and percentage of market share for each defendant); 87 and Table 17 (comparing "defendants' sales figures" to published U.S. Census Data to attempt to show defendant market shares in Indianapolis).

[40] Rausser Report, ¶¶ 92-94 and Figures 7-9, all drawn from defendant transaction data available to plaintiffs prior to July 13, 2007.

[41] Rausser Report, ¶¶ 96 (using IMI transaction data for 4,000 psi concrete sold to Wilhelm and Gibraltar in cointegration tests), 98 and Table 18 (applying a regression model to defendant transaction data to argue that "the second horse barn meeting had a statistically significant and positive (although economically small) effect on the price of RMC").

[42] Rausser Report, ¶¶ 99-104.

[43] Rausser Report, ¶ 104 (emphasis added). Once again, the sole exception is Beaver's data, which was produced on November 29, 2007.

- 21 -

In sum, the Rausser Report is in no way limited to *Daubert* issues. Rather, Dr. Rausser seeks to present a complete "do over" report in support of plaintiffs' motion for class certification. Far from defending Dr. Beyer's original methodology from defendants' *Daubert* challenge, Dr. Rausser is openly critical of Dr. Beyer's original methodology. That point aside, the Rausser Report's avowed direction toward supporting class certification means it is not "limited to the issues raised in the *Daubert* challenge", as required by the Court's June 20, 2008 order. Wholly apart from the untimeliness of the Rausser Report, as in *Allgood* and *Nelson*, it should be stricken on the independent basis that it is not directed to issues raised in the Defendants' *Daubert* challenge.

3. <u>**The Beyer "Reply" Should Be Stricken – It Violates The Court's March 10, 2007 And June 20, 2008 Orders And Contradicts His Deposition Testimony**</u>

Rather than defend the lack of empirical analysis in his original report, Dr. Beyer has "replied" by offering a host of new analyses -- analyses that he didn't even mention in his first report. Moreover, Dr. Beyer's new discussion of price premiums directly contradicts his sworn deposition testimony. Having been caught hiding evidence indicating that one or more competitor commanded a price premium, Dr. Beyer now claims that the same amounts he contended were the most accurate prices are somehow not prices at all. This Court's strongly worded warnings in *Allgood* and *Nelson*, are directly applicable to Dr. Beyer's new report: It should be stricken.

a. **Dr. Beyer's New Report Is Not Responsive To The *Daubert* Challenge But An Attempt To Cure His Failure To Employ The Scientific Method.**

IMI's primary argument in support of its *Daubert* challenge was that Dr. Beyer's opinion was nothing more than an untested hypothesis. (*See IMI's* Motion to Exclude Expert Testimony and Opinions of Dr. John Beyer, Doc. No. 550.) Rather than contend that he in fact followed

- 22 -

accepted principles and methods in his report, which was all that was allowed under the Court' orders, Dr. Beyer's new report attempts to make up for his first report's lack of any empirical analysis, including correlation analysis – which he said was unreliable (Beyer Dep. 173-78) – and cointegration analysis – which he said he hadn't heard of (Beyer Dep. 171).  Dr. Beyer's new work is nothing other than a *change* of methodology, not a defense of his original methodology, and as such, Dr. Beyer's reply is completely outside the strictures of Rule 26(e) and the scope of the Court's limited authorization for reply expert testimony.  In its orders, the Court gave the plaintiffs an opportunity to respond on the *Daubert* issue, with expert testimony, that what Dr. Beyer had already done was a proper application of economic principles and methods.  The Court – and defendants – did not agree to a Mulligan.

In his new report, Dr. Beyer, for the first time, attempts a number of new empirical econometric analyses.  If these were necessary to his opinions, he should have disclosed and done them when he did his original report.  But he neither disclosed the need to do them in his report nor attempted them.  Indeed, nowhere in his report or at his deposition did he say he needed more information before he could perform necessary empirical analysis.

Perhaps the most shameless of these new analyses are Dr. Beyer's correlation and cointegration studies.  Beyer Reply ¶¶ 76-86.  At his deposition, Dr. Beyer testified (1) that he did not need to do correlation studies and (2) that in any event such studies were not reliable because they are highly subjective.  Beyer Dep. 173-78.  He also testified that he had never even heard the term "cointegration" before.  Beyer Dep. 171.  Now, however, he purports to have performed both analyses, and he seeks to establish that Dr. Marshall improperly performed correlation and cointegration, even though Dr. Beyer admitted at his deposition that, unlike Dr.

Marshall, he is not an expert in econometrics. Beyer Dep. 26-27. Dr. Beyer cannot at this late date undertake methodologies he thought were unnecessary/unreliable or didn't even understand.

In fact, Dr. Beyer is acting as a "mouthpiece" for undisclosed experts, "econometricians at Nathan Associates." Beyer Reply ¶¶ 76-86. Unsure about their ability to sneak Dr. Rausser past the Court's orders, plaintiffs' are trying to use Dr. Beyer as a ventriloquist's dummy. This is not permitted under the law. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (affirming the District Court's *Daubert* exclusion of an expert witness because he was simply serving as "the mouth piece of a scientist in a different specialty"). As Judge Posner explained:

> A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

*Id.* Dr. Beyer, by his own admission does not have the expertise to vouch for the work of an econometrician. This is fatal to his new report. A party is not permitted to use one expert to be the conduit for an undisclosed expert in a different specialty. *Id.*

In addition to his new correlation and cointegration analyses Beyer now discloses a number of other analyses that he could have performed in his first report, but didn't:

- **New price premium analysis containing Dr. Beyer's arbitrary subtraction for supposed early pay discounts.** Beyer Reply ¶¶ 12-17. Dr. Beyer attempts to rehabilitate his opinion that no competitor could command a price premium by arbitrarily subtracting certain amounts from the invoice prices the customers were actually invoiced, supposedly to account for some defendants' practices of offering payment terms that sometimes included a discount for early payment. As

- 24 -

discussed at length below, his new theory contradicts his prior deposition testimony in which he vouched for his use of rolling three-month averages of invoice prices. In any event, the information relating to discounts was available in the transaction data and documents produced by defendants before Dr. Beyer did his report. For example, In 2006 IMI produced the named plaintiffs' invoices and thousands of pages of invoice registers which set forth payment terms, including whether there was an early pay discount.[44] (And perhaps more notably, the very plaintiffs that Dr. Beyer claims to have interviewed prior to submitting his report were well-aware of the early pay discount.[45]

---

[44] *See* Exhibit 2 for examples of the named plaintiffs' invoices; Exhibit 3 is sample pages from the invoice register, which indicate payment terms such as whether the customer is a "net" customer or whether the customer is eligible to receive a $3 per cubic yard discount for early pay.

[45] In fact, applying a single discount across the board to all of IMI and Builder's sales is not supported by the evidence. Neither Builders nor IMI offered an early pay discount to all their customers. Browne Dep. (5/14-15/08) 87, 111, 126-27, 137, Ex. 206, 207, 208, 209; Dewey Parks Dep. 65-68. And not all (and perhaps even, not most) customers who were offered a early pay discount took advantage of it either because they had yet to be paid by their own customer for materials or because of the way they paid their bills.

For example, T&R Contractor, one of the named plaintiffs, rarely if ever qualified for an early pay discount. T&R's records show chronically late payments with no discount and threats of loss of credit privileges. Roberto Salazar Dep. 77-89; Ex. 26, 27; *see also* Tim Toth (named plaintiff Cherokee Development) Dep. 47:

> Q:    It's my understanding that certain suppliers provide a discount if you pay on time.
>
> A:    I remember some of those, yes.
>
> Q:    Is that something you considered in choosing a supplier?
>
> A:    Not really.

Dan Grote (named plaintiff) Dep. 47:

- 25 -

- **New price list analyses.** Beyer Reply ¶¶ 25-23. Dr. Beyer purports to offer a series of new analyses related to products, price lists, and sales. Beyer had the price lists and the transaction data that are the bases of these new analyses but did not undertake them in his original report.

- **New job-size analysis.** Beyer Reply ¶¶ 37-39. Beyer attempts to draw certain conclusions regarding different competitors' ability to serve certain sized jobs. The information relating to job size was available in the transaction data that Beyer had prior to his report, but he did not do this analysis.

- **New sub-market analyses.** Beyer Reply ¶¶ 62-64. In Dr. Beyer's new report he presents analyses purporting to show that neither distance from job site nor plant location had an affect on price. *Id.* Both analyses used data available when he did his first report. His analysis on delivery times used data solely from Builders, IMI, and Prairie, which was available at the time of his first report.[46] Similarly, the data for his analysis of county pricing was available from IMI, Builders,

---

Q:    Do you receive discounts from the price of concrete on the price list?

A.    If they offer one, if you pay early, you get a discount, sometimes I, you know, try to pay on time and get that, yeah.

Dr. Beyer ignores these facts.

[46] Beyer cites no evidence as to whether the data he is using contains accurate delivery times. And, these are the suppliers that had the most plants and therefore the largest geographic coverage, thus there shortest delivery times. What is perhaps most notable about this analysis is the wide price difference between the different products. For example, Beyer's new Figure E-2 shows a price difference of $35.00 for deliveries of the "same" product, which indicates something other than price (e.g. service, relationship capital, etc.) is driving the transaction.

Prairie, Shelby, and American at the time of his report.[47]  Beaver's data was available months before his deposition.  Nevertheless, he never did these analyses nor indicated that such analyses were necessary.

- **New analysis purporting to show that price dispersion is "job related, not transaction related."** Beyer Reply ¶¶ 87-93.  Dr. Beyer noted in his report and at his deposition that price dispersion – he called it "volatility" -- was not unexpected.  That was his justification for using a rolling three-month average. Beyer Rept. fn. 50; Beyer Dep. 157-58.  Nevertheless, he did not undertake this analysis in his original report, even though he had the data.

- **New opinion and analysis regarding the alleged effectiveness of the conspiracy.**  Beyer Reply ¶¶ 94-103.  For the first time, Dr. Beyer attempts to analyze whether that data supports a conclusion that the alleged conspiracy was effective.   In his deposition, Dr. Beyer said that he accepted the plaintiffs' allegations of the conspiracy as given and that determining the effectiveness of the alleged conspiracy was for a "subsequent stage of the litigation," after class certification.  Beyer Dep. 37-39, 47.  Thus, in his prior report he did no study whatsoever of whether the conspiracy was effective or ineffective, though he had the data to undertake the analysis he presents in his new report.

As he has done in many cases before, Dr. Beyer has tried to rely on defendants' experts to tell him what he should do.  However, Dr. Beyer's obligation (and plaintiffs') under the law was to

---

[47] In fact, the pricing shows price differences among counties.  For example, "visual inspection" shows that Beavers prices for 4000 PSI sold out of its Morgan County plant were almost always cheaper than prices from its Hamilton County plant, and for long stretches of time, $4 or $5 cheaper.  Beyer Reply, Figure 11.  Once again, Beyer did no statistical analysis of these differences or trends but merely stated a conclusion.

provide a full report, containing all his opinions and disclosing his full methodology.  Now is too late to him fix his failure to adhere to the scientific method.

### b.    Dr. Beyer's New Discussion Regarding Price Premiums Contradicts His Deposition Testimony And Should Be Stricken

It is well settled that a witness cannot negate his own deposition testimony with a contradictory affidavit.  The contradiction renders the affidavit unreliable, and the remedy is to disregard or strike the affidavit.  *Boomsma v. Star Transp., Inc.*, 202 F.Supp.2d 869, 877 (E.D. Wisc. 2002)(striking affidavits of two experts that contradicted their deposition testimony; obvious that plaintiffs were trying to "repair" their experts deposition testimony by submitting new affidavits); *Danis v. USN Communications, Inc.*, 121 F.Supp.2d 1183, 1189 -1190 (N.D.Ill. 2000)(trial court refused to consider expert's affidavit that contradicted prior deposition testimony); *Clark v. Takata Corp,.* 192 F.3d 750, 755 (7th Cir. 1999) (affirming Judge Tinder's striking a contradictory affidavit); *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir, 1998).

At his deposition, Dr. Beyer testified at length (1) that the defendants' transaction data, as reflected in his figures 7-11, showed that no competitor could command a price premium and (2) that three-month weighted averages using invoice prices taken from the transaction database were the best way to measure price.  Now, confronted in IMI's *Daubert* motion with the fact that these charts and pricing *do* show evidence of a price premium, Dr. Beyer wants to ignore his prior testimony, even going so far as to accuse IMI's expert Dr. Umbeck of misunderstanding his prior use of the data and of using the wrong prices.

First, although Dr. Beyer now states in his new report that "the analysis summarized in the figures presented in my class certification declaration was never intended to examine whether

one supplier was consistently able to charge a higher price than other suppliers for the product,"

his testimony, under oath, was exactly the opposite:

> Q:    You make a statement in paragraph 22 of your report that no supplier was able to successfully brand, and by that I mean no supplier of ready-mixed concrete in the 10-county area was able to successfully brand to gain a price premium.
>
> A:    Yes.
>
> Q:    And on what did you base that statement?
>
> A:    [Discussion of purchaser depositions and Form 302's.]
>
> Q:    Anything else?
>
> A:    And the transaction database, because I did – and you have some examples of this – selective comparison of pricing, and there did not appear to be any premium that was systematic, consistent on the part of any major supplier.
>
> *  *  *
>
> Q:    What transaction data did you examine with respect to whether any seller of ready-mix in the ten-county area was getting a premium with respect to any product?
>
> A:    I examined the prices by different suppliers for standard, by which I mean the large purchase or sale item from each of the suppliers, calculated average prices and examined the relationship. And what I saw – been a number of both for preparation of the report and subsequent to it; and what I saw was the absence of any persistent, as I've just defined it, price premium by one supplier compared to the others.
>
> *  *  *
>
> Q:    The information you you're speaking of in your report, what charts is that on?
>
> A:    Well, it would be the various price comparisons that are done, referred to in my report, and then a series of figures that are presented in the appendix.
>
> Q:    The information you're talking about is set forth on Figure 8, 9, and 10, 11, is that correct?  Obviously not the stuff you were

referring to the subpoena yesterday, but insofar as what's in your report is my question.

A:    Be Figure 7 through 11, where there is comparison of the price behavior among two or more suppliers for a given product.

Beyer Dep. 146-152.    Thus, Dr. Beyer's statement in his new report that he did not use the figures as a justification of his conclusion that there was no price premium is directly contradicted by his sworn deposition testimony.

Second, at his deposition, Dr. Beyer defended his use of rolling three-month weighted average invoice prices from the transaction database as the best reflection of what he termed the "underlying price." Beyer Dep. 156-159. Now, he claims that these very prices he identified as being the best prices should not be used. Beyer Reply ¶¶ 17-20.[48] Now, Dr. Beyer claims that early pay discounts and rebates should be subtracted before comparing prices. However, at his deposition when confronted with figures he said contained the correct prices but without the index, Dr. Beyer said the obvious price differences were due to customer mix and quantity variations. Beyer Dep. 161-64. He said nothing about discounts, even though the availability of early pay discounts and other payment terms was known before Dr. Beyer submitted his report. Again, the availability of the early pay discount reflected on many of the documents Dr. Beyer

---

[48] Dr. Beyer even goes so far as to challenge Dr. Umbeck's use of these prices, even though all Dr. Umbeck did was use the prices Dr. Beyer had identified as the prices to use and the ones he, in fact, said he used. And again, Dr. Umbeck's role in this matter was simply to evaluate whether Dr. Beyer applied accepted principles and methods of economic science. Umbeck Rept. 2. Dr. Umbeck's central criticism of Dr. Beyer was that he did no empirical testing of his conclusions. Umbeck Rept. 4. He also pointed out that Dr. Beyer's use of the index in his figures 7-11 actually hid the price premium Dr. Beyer said the figures showed was not present. Umbeck Rept. 4-11; 35. And, Dr. Umbeck also criticized the use of the three month rolling average as improperly smoothing out price variations. *Id.* Nevertheless, Dr. Umbeck accepted Dr. Beyer's prices to illustrate that even using Dr. Beyer's prices there were observable price differences that indicated certain competitors could command a price premium. Umbeck Rept. 4-11. Such a brazen lack of integrity should not prevail, and IMI will address this issue more fully under separate cover in response to plaintiffs' motion to strike portions of the report of Dr. Umbeck.

- 30 -

relied on, including price sheets, bid documents, and invoices.  And perhaps even more directly, the availability of the early pay discount was well-known by the named plaintiffs, some of whom Dr. Beyer actually interviewed.  (*See* fn. 45, *supra*.)

Dr. Beyer's attempt to contradict his sworn deposition testimony on the price premium issue with a new affidavit and new analyses should not be countenanced by the Court.  Even apart from Dr. Beyer's and plaintiffs' violations of the Court's scheduling order, Paragraphs 12-24 of Dr. Beyer's new report should be stricken.

### C.    The Class Reply And *Daubert* Response Are So Replete With Improper Expert Testimony That They, Too, Should Be Stricken.

Plaintiffs' class reply and *Daubert* response rely` pervasively on the untimely and improper expert testimony presented in the Rausser Report and Beyer Reply.  This expert testimony, presented in clear violation of the Court's orders as described above, cannot be disentangled from the remainder of plaintiffs' arguments.  Accordingly, both the Class Reply and *Daubert* Response should be stricken in their entirety.[49]  As in *Allgood* and *Nelson*, the prejudice and delay caused by these filing can only be cured by striking them from the record in their entirety.  The alternative, once again, is a new round of expert production, depositions and reports not contemplated by the Court's scheduling orders.

---

[49] As noted above, the *Daubert* response should also be stricken on the independent grounds that it was not included in the class reply and is thus 35 pages over length.

I/2240364.5

IV.    **Conclusion**

For the foregoing reasons, the Beyer Reply, Rausser Report and plaintiffs' Class Reply and *Daubert* Response based on those reports, should be stricken from the record.

Respectfully submitted,

/s/ G. Daniel Kelley, Jr.
G. Daniel Kelley, Jr., #5126-49
Thomas E. Mixdorf, #16812-49
Edward P. Steegmann, #14349-49
Anthony P. Aaron, #23482-29
Abigail B. Cella, #24825-49

Attorneys for IMI Defendants

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282
(317) 236-2100

/s/ Judy L. Woods (by permission)
Judy L. Woods, Attorney No. 11705-49
Melinda R. Shapiro, Attorney No. 18153-49
Curtis T. Jones, Attorney No. 24967-64

Attorneys for Defendants
Builder's Concrete & Supply, Inc.
Gus B. ("Butch") Nuckols, III, and
John L. Blatzheim

BOSE McKINNEY & EVANS LLP
2700 First Indiana Plaza
135 North Pennsylvania Street
Indianapolis, IN  46204
(317) 684-5000

/s/Edward W. Harris III (by permission)
Edward W. Harris, Attorney No.
Gayle A. Reindl, Attorney No.
Jonathan G. Polak, Attorney No.
Abram B. Gregory, Attorney No.

Attorneys for Defendant
Beaver Materials Corporation

- 32 -

I/2240364.5

TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713-3500

I/2240364.5

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2008, a copy of the foregoing was served electronically on the following counsel:

Robert K. Stanley
James H. Ham, III
Kathy Lynn Osborn
BAKER & DANIELS
300 North Meridian Street
Suite 2700
Indianapolis, IN  46204
rkstanle@bakerd.com
jhham@bakerd.com
klosborn@bakerd.com

Judy L. Woods
Curtis L. Jones
Steven M. Badger
BOSE McKINNEY & EVANS, LLP
135 North Pennsylvania Street
Suite 2700
Indianapolis, IN  46204
jwoods@boselaw.com
cjones@boselaw.com
sbadger@boselaw.com

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
Eric S. Pavlak
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com
epavlack@cohenandmalad.com

J. Lee McNeely
Brady J. Rife
McNEELY STEPHENSON THOPY
  & HARROLD
30 East Washington Street
Suite 400
Shelbyville, IN  46176
jlmcneely@msth.com
bjrife@msth.com

Chris Gair
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL  60611-7603
cgair@jenner.com

Michael S. Denniston
BRADLEY ARANT
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203-2104
mdenniston@bradleyarant.com

George W. Hopper
Jason R. Burke
HOPPER BLACKWELL
111 Monument Circle, Suite 452
Indianapolis, IN  46204
ghopper@hopperblackwell.com
jburke@hopperblackwell.com

I/2240364.5

Edward W. Harris, III
Gayle A. Reindl
Jonathan G. Polak
Abram B. Gregory
TAFT LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
eharris@taftlaw.com
greindl@taftlaw.com
jpolak@taftlaw.com
agregory@taft.com

Stephen D. Susman
Barry C. Barnett
Jonathan Bridges
SUSMAN GODFREY LLP
901 Main Street
Suite 4100
Dallas, TX 75202
ssusman@susmangodfrey.com
bbarnett@susmangodfrey.com
jbridges@susmangodfrey.com

Frank J. Vondrak
Michael W. Boomgarden
Jonathan A. Epstein
Eric L. Schleef
U.S. Department of Justice
Antitrust Division
209 South LaSalle Street
Suite 600
Chicago, IL 60604
frank.vondrak@usdoj.gov
michael.boomgarden@usdoj.gov
jonathan.epstein@usdoj.gov
eric.schleef@usdoj.gov

s/s G. Daniel Kelley, Jr.
G. Daniel Kelley, Jr., #5126-49
Daniel.Kelley@icemiller.com

*Attorneys for IMI Defendants*

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, Indiana 46282
(317) 236-2100

I/2240364.5