UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| IN RE: READY-MIXED CONCRETE | ) | Master Docket No. |
| ANTITRUST LITIGATION, | ) | 1:05-cv-00979-SEB-JMS |
| | ) | |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

**ORDER ADDRESSING PENDING MOTIONS**

This cause is before the Court on the following motions:  Plaintiffs' Motion to
Certify Class [Docket No. 397], filed on August 1, 2007; IMI Defendants' Motion to
Exclude Expert Testimony and Opinions of Dr. John Beyer [Docket No. 550], filed on
April 7, 2008; Motion of Builder's Defendants to Exclude Report and Testimony of John
C. Beyer [Docket No. 558], filed on April 7, 2008; Plaintiffs' Motion to Strike Portions of
the Expert Report of John R. Umbeck [Docket No. 672], filed on October 8, 2008; and
Defendants' Motion to Strike Plaintiffs' October 8, 2008 Filings [Docket No. 682], filed
on October 21, 2008.

For the reasons detailed below, Plaintiffs' Motion to Certify Class is <u>GRANTED</u>;
IMI Defendants' Motion to Exclude is <u>DENIED</u>; Builder's Motion to Exclude is
<u>DENIED</u>; Plaintiffs' Motion to Strike is <u>DENIED</u>; and Defendants' Motion to Strike is
<u>GRANTED</u>.

## *Factual Background*

Plaintiffs are a group of businesses - corporations, limited liability companies, and sole proprietorships - all of which are located in the Central Indiana area.[1]  Defendants, also numerous, include Irving Materials, Inc. ("IMI"), which is an Indiana corporation with its principal place of business in Greenfield, Indiana, and Builder's Concrete & Supply, Inc. ("Builder's"), which is an Indiana corporation with its principal place of business in Fishers, Indiana.[2]  Defendants are producers and sellers of ready-mixed concrete in the Central Indiana area, as well as individual executives at these companies.

Plaintiffs have brought this action on behalf of themselves and, under Federal Rule of Civil Procedure 23, as representatives of the following class:

> All individuals, partnerships, corporations, limited liability companies, or other business or legal entities who purchased ready-mixed concrete directly from any of the Defendants or any of their co-conspirators, which was delivered from a facility within the Counties of Boone, Hamilton, Hancock, Hendricks, Johnson, Madison, Marion, Monroe, Morgan, or Shelby in the State of Indiana, at any time from July 1, 2000 through May 25, 2004, but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and federal, state, and local government entities and political subdivisions.

Pl.'s Motion to Certify at 1-2; see also Second Amended Compl. at ¶ 37.

According to Plaintiffs, "[t]hroughout the Class Period, defendants and their co-

---

[1]Plaintiffs include Kort Builders, Inc., Dan Grote, Cherokee Development, Inc., Wininger/Stolberg Group, Inc., Marmax Construction, LLC, Boyle Construction Management, Inc., and T&R Contractor, Inc.

[2]Other Defendants include: Ready Mixed Concrete Company; Hughey, Inc. d/b/a Carmel Concrete; MA-RI-AL Corporation and Beaver Materials Corporation; and numerous individual citizens of Indiana who served as executives of these companies.

conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in Ready-Mixed Concrete in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." Compl. ¶ 45.[3] As a result of this conspiracy, Plaintiffs allege, members of the purported class "paid artificially inflated prices for Ready-Made Concrete and have suffered antitrust injury to their business or property." Id. at ¶ 3.

The central issue presently before the Court is whether Plaintiffs' purported class should be certified. However, this issue, like the smallest encased figure in a set of Matryoshka nesting dolls, is embedded in a series of other issues which require resolution before the class certification issue can be decided.

A review of the complex procedural history of the case will facilitate an understanding of these interlocking issues. On August 1, 2007, Plaintiffs filed their Motion to Certify the Class, in support of which Plaintiffs engaged Dr. John C. Beyer as an expert economist. Defendants in response engaged three experts: Dr. Jerry A. Hausman, Dr. John R. Umbeck, and Dr. Robert C. Marshall.

In anticipation of challenges to Dr. Beyer's testimony under Daubert v. Merrell Dow Pharms. Inc. 509 U.S. 579 (1993), the parties in consultation with the Magistrate Judge agreed that the schedule as it then existed would have generated separate and

---

[3]Because this is a civil suit, "Plaintiffs bring this action for treble damages, costs of suit, attorneys' fees, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for the injuries sustained by plaintiffs and members of the Class arising from violations of Section 1 and the Sherman Act." Compl. ¶ 4. Prior to this lawsuit, the United States prosecuted Defendants under the criminal antitrust laws, resulting in numerous guilty pleas and at least one conviction, as further discussed below.

extensive briefing of both the class certification issue and the <u>Daubert</u> contentions advanced by both parties, a process that clearly would be "cumbersome, potentially duplicative, and protracted."  Order Entry of November 8, 2007 [Docket No. 454].  The parties sought to streamline the briefing schedule due to their shared concern over "never-ending or ever-changing expert opinions."  <u>Id.</u>  Accordingly, pursuant to a joint motion by the parties, on December 12, 2007, the Magistrate Judge amended the case management plan to require combined briefing of these two issues by Defendants.[4]

On April 7, 2008, as anticipated, IMI Defendants and Builder's Defendants filed separate, but similar, Motions to Exclude Dr. Beyer's testimony pursuant to <u>Daubert</u> and, in accordance with the Magistrate Judge's orders, IMI and Builder's concurrently filed, briefs that combined:  (1) their responses to Plaintiffs' Motion for Class Certification; and (2) their briefs in support of their <u>Daubert</u> challenges to Dr. Beyer.[5]  In support of both of these issues, Defendants submitted the testimony of their three experts.

The Magistrate Judge's order of December 12, 2007, also required Plaintiffs to file a consolidated Reply.  To avoid "ever-changing expert reports," the order stated:

---

[4]"Defendants shall file their response to Plaintiffs' Motion for Class Certification on or before March 17, 2008 . . . .  Defendants shall also raise any <u>Daubert</u> challenges in their opposition brief and file any supporting materials with the response brief."  Order Entry of December 12, 2007 [Docket No. 469].

[5]IMI sought leave to file a Response brief in excess of 35 pages and was granted leave to file a combined Response not in excess of 55 pages.  IMI's brief as docketed was 55 pages.  Builder's combined Response totaled 34 pages, in accordance with the page limits established by Local Rule 7.1.  Also, on this date, other Defendants filed briefs related to class certification which are pertinent to the issues discussed here.

"Plaintiffs shall file their reply in support of class certification which shall include their response to any <u>Daubert</u> challenges on or before May 15, 2008.  Any additional expert testimony filed in support is limited to the issues raised in the <u>Daubert</u> challenge."  <u>Id.</u> (emphasis added).[6]

On September 29, 2008, Plaintiffs requested leave to file a combined Reply of 90 pages.  Defendants responded that, "considering . . . that Plaintiffs intend to respond separately to the <u>Daubert</u> motions, even 75 pages seems very, very excessive." [Docket No. 669] at 1.  On October 6, 2008, the Magistrate Judge issued an order partially granting Plaintiffs' request by granting Plaintiffs leave "to file a Combined Reply . . . not to exceed 60 pages."  Order of Oct. 6, 2008 [Docket No. 670].

On October 8, 2008, the date Plaintiffs' Combined Reply was due, Plaintiffs filed two briefs: a Response to Defendants' Motions to Exclude, which totaled 35 pages, and a separate Reply in support of their Motion to Certify the Class, totaling 60 pages.  Plaintiffs attached two supporting expert reports to these filings: Dr. Beyer's Reply Declaration; and the Declaration of Dr. Gordon Rausser, Ph.D.

Believing that the length and scope of this Combined Reply and the expert testimony attached to it violated the Court's specific page limitations, Defendants filed, on October 21, 2008, a Motion to Strike Plaintiffs' October 8, 2008 filings.  Because the

---

[6]The Court repeated this limitation in its June 20, 2008 order: "Plaintiffs shall file their reply in support of class certification which shall include their response to any <u>Daubert</u> challenges on or before October 6, 2008.  Any additional expert testimony filed in support is limited to the issues raise in the <u>Daubert</u> challenge." Order of June 20, 2008 [Docket No. 617].

substance of those filings bears upon the Court's determination of the <u>Daubert</u> issues

presented, and in turn upon the class certification issue, we address Defendants' Motion

to Strike first.

## *Legal Analysis*

### I. *Defendants' Motion to Strike*

Defendants have moved to strike Plaintiffs' October 8, 2008, filings, including: the

report of Plaintiffs' new expert, Dr. Rausser ("Rausser Report"); Dr. Beyer's Reply

Declaration ("Beyer Reply"); Plaintiffs' Consolidated Response in Opposition to

Defendants' Motion to Exclude the Expert Testimony of Dr. John R. Beyer; and

Plaintiffs' Consolidated Reply In Support of Motion for Class Certification.  According to

Defendants, these filings violate the Court's orders in two ways: (1) the new expert

reports do not constitute "supplemental" reports pursuant to Rule 26 of the Federal Rules

of Civil Procedure, but rather engage in a complete "do-over" of Plaintiffs' expert

testimony, in violation of the Court's orders; and (2) Plaintiffs' October 8, 2008, filings

exceed the page limits established by the Court's orders.

### A. *Supplemental Report*

Defendants' "do-over" contention complains that Plaintiffs' expert testimony is

not "supplemental" in the sense contemplated by Rule 26.  Under Rule 26 and our prior

orders, the plaintiff may offer and expert rebuttal report, which "does exactly what it says: it rebuts, in the form of a complete statement of all of the opinions expressed by the author, the report of the opposing party's expert." Long Term Capital Holdings v. United States, 2003 WL 21518555, at *2 (D.Conn. 2003); see also Talbert v. City of Chicago, 236 F.R.D. 415, 422 (N.D. Ill. 2006) (discussing court's broad discretion to allow supplemental expert reports). However, "[t]he purpose of supplementary disclosures is just that - to supplement. Such disclosures are not intended to provide an extension of the expert designation and report production deadline." Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 324 (5th Cir. 1998). In other words, "although Fed.R.Civ.P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." Allgood v. General Motors Corp., 2007 WL 647496, at *4 (S.D. Ind. 2007) (Hamilton, J.) (quoting Beller v. United States, 221 F.R.D. 689, 695 (D.N.M. 2003)).

In Allgood v. General Motors Corp., our colleague, Judge Hamilton, addressed a motion to strike analogous to the motion presented here. The Court struck the plaintiff's expert report because it went beyond rebutting the defendant's response, in violation of the Court's orders and Rule 26. In Allgood, the original expert report was largely preliminary, leaving to a "future" expert the task of undertaking specific calculations. Id. at *2. The new report, filed as a rebuttal to the defendants' expert reports, contained "detailed valuation[s]" and expressed new opinions based on full evaluations of facts

7

which were discussed only in general terms in the original report.  Id.  The Court, in

Allgood, characterized this report as entirely new expert testimony and found plaintiffs'

"attempt to describe the new . . . report as a 'supplement'" to be "baseless."  Id.  The

Court rejected the notion that the Rule 26 "give[s] the producing party a license to

disregard discovery deadlines and to offer new opinions under the guise of the

'supplement' label."  Id. at 3.

A brief review of the new expert reports contained in Plaintiffs' October 8, 2008,

filings discloses that they are similarly faulty.  Unlike Dr. Beyer's original report, which

contained merely general conclusions, the Beyer Reply employs a host of new detailed

analyses.  The second Beyer report advances a new price premium analysis based on new

payment terms as well as other new analyses based on customer job size and similar facts,

none of which was developed in the original report.  See Beyer Reply ¶¶ 12-17, 25, 37-

39.  The Beyer Reply also reaches new conclusions relating to the effectiveness of the

conspiracy.  Id. at ¶¶ 94-103.  To a large extent, these new analyses are directed at the

most significant issues in the case.

The Beyer Reply is not the only instance of a late-breaking expert analysis

advanced by Plaintiffs.  The Rausser Report also devotes a major part of its analysis to

new arguments in support of Plaintiffs' request for class certification.  See, e.g. Rausser

Report at ¶¶38-56, 96, 99-104.  Dr. Rausser's analyses extended well beyond Dr. Beyer's

conclusions.  See, e.g. id. at ¶¶ 39-47, 50-51.  Clearly, these submissions do not fairly

qualify as supplementation.  Allgood, 2007 WL 647496, at *2.

8

Accordingly, we conclude that these submissions are not "supplemental," as contemplated by Rule 26 but are instead entirely new expert opinions which must therefore be stricken.  As <u>Allgood</u> recognized, to "rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports . . . ."  <u>Allgood</u>, 2007 WL 647496, at *4  (quoting <u>Beller</u>, 221 F.R.D. at 695).

## B.  Permission in the Order

Plaintiffs argue that, even if the new reports were not technically "supplemental" pursuant to Rule 26, they are nonetheless permissible filings under the Magistrate Judge's orders of November 8, 2007, December 12, 2007, and June 20, 2008, which, among other things, outlined the permissible scope of Plaintiffs' Reply in this fashion:  "Plaintiffs shall file their reply in support of class certification which shall include their response to any <u>Daubert</u> challenges on or before May 15, 2008.  Any additional expert testimony filed in support is *limited to the issues raised in the <u>Daubert</u> challenge*."  Order of December 12, 2008 (emphasis added).

Defendants maintain that, under the plain language of the Court's orders, Plaintiffs' response was limited to an attempt to justify Dr. Beyer's original method. Plaintiffs rejoin, stating that "the Reply Declaration of Dr. Beyer and Declaration of Gordon Rausser do exactly what is permitted by this Court's June 20, 2008 Order: they

9

respond to the issues raised in Defendants' <u>Daubert</u> challenges."  Pl.'s Response at 1.[7]

In addressing the "issues raised in the <u>Daubert</u> challenge," Plaintiffs note that Defendants' <u>Daubert</u> challenges were inextricably intertwined with their arguments opposing class certification and that Defendants' Response thus defined the scope of Plaintiffs' Reply.  Plaintiffs were required by the Court's orders to combine their briefing on class certification and <u>Daubert</u> issues; similarly, Defendants were required to combine their class certification responses with their briefs in support of their <u>Daubert</u> motions. Given this briefing structure, we must attempt now to determine whether the two issues were sufficiently separate to allow Plaintiffs to address each of them.

Defendant Builder's briefing clearly separated its discussion of these issues. Section I of Builder's brief, "Class Certification Should be Denied," addresses only the class certification issues.  In doing so, Builder's avoids any challenges to Dr. Beyer's methodology and limits its arguments to those opposing class certification.  Sections II and III of the Builder's brief, entitled "The Standard for Admitting or Excluding Expert Witness Testimony" and "Applying the <u>Daubert</u> Standard in this Case Means Dr. Beyer's Testimony Should be Excluded," address only the <u>Daubert</u> issues, challenging Beyer's methodology and reliability.  Builder's Response is thus quite clearly delineated, effectively rebutting Plaintiffs' argument that they were unable to distinguish the two

---

[7]Although Plaintiffs acknowledge the clarity of the Court's language, they contend that "the scope of the Beyer Reply and Rausser Declaration are a direct result of the defense experts' reports going far beyond mere criticism of Dr. Beyer's methodology and analysis."  Pl.'s Response at 1.

issues based upon this briefing.

IMI's briefing is not so clear.  Because the brief's sections are assigned various topical headings that do not clearly separate coverage of class certification and <u>Daubert</u> issues, a closer examination of these arguments is required.

In an attachment to its motion, IMI clearly sets out those issues which it considers to be related directly to its <u>Daubert</u> challenge.  Attachment B, entitled "Outline of Dr. Beyer's Failures to Follow Accepted Principles and Methods of Economic Science," contains sixteen separate challenges to Dr. Beyer's methodology.  This attachment does not, however, go further than identifying the issues IMI delineated as <u>Daubert</u> challenges. It does not, by itself, refute Plaintiffs' claim that the brief intermingled <u>Daubert</u> issues and class certification issues.

From our review of the brief, it is clear that the first section supports IMI's <u>Daubert</u> challenges.  Nothing following page 19 of the brief can accurately be labeled a <u>Daubert</u> challenge.  Thus, our inquiry focuses on whether, based on the first section, Plaintiffs reasonably could have distinguished <u>Daubert</u> certification issues from class certification issues.

Defendants first challenge Dr. Beyer's general conclusion of common proof of impact.  Despite Plaintiffs' claim that this attack on Beyer's "conclusions" includes class certification issues as well, the discussion in fact relates entirely to Beyer's method and thus to the <u>Daubert</u> question.  The same is true of Defendants' attack on the "index" Dr. Beyer uses, which also relates only to his methodology.  <u>See</u> Def.'s Br. in Supp. at 6-9.

11

The following section of the brief addresses Dr. Beyer's "price structure" approach to evaluating concrete prices over time, none of which relates to or includes substantive class certification issues.  Thereafter, Defendants discuss at length a number of tests Dr. Beyer did not use as well as a number of assumptions upon which certain of Dr. Beyer's conclusions were based.  Clearly, this discussion pertains to Dr. Beyer's methodology and the reliability of his calculations, and could not reasonably be confused with substantive argumentation about the merits of Plaintiffs' class certification motion.

Thus, Plaintiffs have no refuge in the Court's orders.  Because the Beyer Reply and the Rausser Report went beyond addressing "issues raised in the Daubert challenge" thereby constituting an obvious attempt to submit entirely new expert evidence, these submissions violate the requirements of Rule 26 as well as the Court's prior orders.  The reports Plaintiffs filed on October 8, 2008, and the arguments they support, accordingly must be stricken.

*C.  Page Limits*

Defendants also contend that Plaintiffs' October 8, 2008, filings must be stricken because they exceeded the page limits established by the Magistrate Judge's order of October 6, 2008, which provided that "Plaintiffs are granted leave to file a *Combined Reply* in Support of Motion for Class Certification not to exceed 60 pages." Order of October 6, 2008, at 1 (emphasis added).

When a party ignores the page limits established by the local rules or by orders of

the court, the court typically strikes the party's brief or simply strikes the excess pages.

See, e.g. Aspera v. Copperweld Corp., 2006 WL 488686, at *2 (N.D. Ill. Feb. 24, 2006).

In Range v. Brubaker, 2009 WL 161699 (N.D. Ind. Jan. 21, 2009), the plaintiff "filed a

Motion seeking leave to file a responsive brief in excess of 500 pages."  Range, 2009 WL

161699, at *1.  The magistrate judge partially granted the request by permitting him to

file a brief not to exceed 40 pages.  The plaintiff filed seven separate responsive briefs,

none of which "individually exceeded the forty page limit but, all told, the briefs total[ed]

nearly 180 pages."  Id.

      In our case, although Plaintiffs did not request excess pages to the extent sought by

the plaintiff in Range, they did request permission to file a 90-page brief, a size far in

excess of the usual 20 pages.  See Local Rule 7.1.  As in Range, the Magistrate Judge

partially granted the request, allowing Plaintiffs permission to file 60 pages, which the

Court clearly indicated was to encompass the entire "Combined Reply."[8]  In

contravention of the Magistrate Judge's order, and in a fashion similar to that of the

Plaintiff in Range, Plaintiffs filed two briefs, neither of which exceeded 60 pages but

which combined exceeded even the 90-page limit originally requested.  The parties

obviously were required to comply with the Court's orders.  By filing briefs which

exceeded the page limitations imposed by the Court, Plaintiffs' filings cannot stand of

_____

[8]Plaintiffs contend that they believed that the Court's "grant of 60 pages for the class
certification reply presumably was based in part on the fact that Plaintiffs would be filing their
Daubert response separately, as pointed out in Defendants' opposition to Plaintiffs' request for
90 pages."  Id. at 24.  However, we view the order to be absolutely clear that the 60 pages
referred to Plaintiffs' "Combined Reply"; thus, this argument is unavailing.

record.[9]  Accordingly, the briefs Plaintiffs filed on October 8, 2008, must be stricken.


*D. Rule 26 Balance*

We note, finally, an analysis of the factors for determining whether a Rule 26(a)

violation has occurred supports striking plaintiffs' October 8, 2008, filings.  "The

determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the

broad discretion of the district court."  David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th

Cir. 2003).  The trial court is directed to consider the following factors: "(1) the prejudice

or surprise to the party against whom the evidence is offered; (2) the ability of the party to

cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or

willfulness involved in not disclosing the evidence at an earlier date."  Id.

In the case at bar, the newly disclosed expert theories and methods came as a

surprise to Defendants, the only adequate response to which would be the repetitive and

complex expert analysis the Court's limiting orders sought to prevent.  The burden of

such a duplicative analysis both in terms of preparing it and the Court's reviewing it,

would disrupt and delay this already protracted litigation.  Furthermore, although no

evidence of bad faith exists to suggest that Plaintiffs intentionally and with intent to

---

[9] We also note that, by filing separate briefs, Plaintiffs contravened the Magistrate
Judge's specific order that the Reply relating to class certification be filed in combination with
the Response relating to Daubert issues.  See Order of December 12, 2007 at 2 ("Plaintiffs shall
file their reply in support of class certification *which shall include* their response to any Daubert
challenges . . . .) (emphasis added).  As the court ruled in Range, we too reject the notion that it
was  "impossible for [Plaintiffs] to file a single responsive brief" to address numerous
Defendants' briefs.  Range, 2009 WL 161699, at *1.

prejudice Defendants exceeded the scope of the Court's orders, there is no doubt that their filings violated both the purpose and the clear wording of our prior orders.  Accordingly, Plaintiffs' excessive filings violated Rule 26 and must and shall be stricken.

## II. Defendants' Motions to Exclude

Defendants seek to exclude the expert testimony of Dr. John Beyer.[10]  Dr. Beyer evaluated the ready-mixed concrete industry in Central Indiana and concluded that common proof can be used to establish class-wide impact and damages in this litigation. According to his report, two accepted methodologies are available for determining common impact and assessing damages on a class-wide basis: regression analysis and benchmarking.  Beyer Rep. at 1.

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms. Inc. 509 U.S. 579 (1993).  Applying this framework, courts must undertake:

> a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed.R.Evid.

---

[10]Defendants' arguments in favor of excluding this testimony are set out in two separate motions, one from the IMI Defendants, the other from the Builder's Defendants.  Because these motions address the same issues, they do not require separate discussion by the Court.

702); see also Kumhoe Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (extending the Daubert admissibility framework to expert testimony in the social sciences).  "The Daubert standard applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise."  Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000) (citing Kumho, 536 U.S. at 141).  Where an expert's opinions pertain to the question of whether a class should be certified, "a substantially relaxed Rule 702 analysis" is appropriate.  In re Fedex Ground Package Sys., Inc., Employment Practices Litig., 2007 WL 3027405, at *4 (N.D. Ind. Oct. 15, 2007) (noting that a court assessing Federal Rule of Civil Procedure 23 is "for all practical purposes, conducting a bench trial and serving as a trier of fact"); see also Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004).

A.  *Dr. Beyer's Qualifications*

We begin with a determination of Dr. Beyer's expertise and whether on that basis he is qualified to perform the calculations and arrive at the conclusions contained in his report.  "A court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."  Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000).  The "scientific knowledge" contemplated by Daubert "connotes more than subjective belief or unsupported speculation."  Porter v. Whitehall Labs., Inc., 9 F.3d 607,

613-14 (7th Cir. 1993).  To suffice, the proffered expert's knowledge must have "a

grounding in the methods and procedures of science."  Daubert, 509 U.S. at 590.

Dr. Beyer is an "applied micro-economist," and it is obvious from his report and

deposition that he has a great deal of experience in this field.  Dep. of Beyer at 26.

Moreover, it is clear, based on the record of previous cases, that Dr. Beyer is experienced

in offering opinions related to class impact based on benchmarking and regression

analysis.  See, e.g. Midwestern Machinery v. Northwest Airlines, Inc., 211 F.R.D. 562

(D. Minn. 2001).

Asserting generally that Dr. Beyer must be qualified as an econometrician to

testify as a Rule 702 witness in this case, Defendants seek to undermine his qualifications

by pointing to the distinction between economics and econometrics drawn by Dr. Beyer

himself in his deposition testimony: "I would not put forward myself as an expert in

econometrics . . . . As the court determines an expert, I would not proffer myself as an

expert."  Dep. of Beyer at 26, 27.[11]

_____

[11]Defendants urge, based on dicta contained in Dura Automotive Systems of Indiana, Inc.
v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002), that this admission renders him unqualified: "A
theoretical economist, however able, would not be allowed to testify to the findings of an
econometric study conducted by another economist if he lacked expertise in econometrics and
the study raised questions that only an econometrician could answer." Dura Automotive, 285
F.3d at 614.  Defendants mischaracterize Dura Automotive's holding as it applies to this case.
Dr. Beyer's expertise is not lacking under this formulation, as he is an applied (not theoretical)
economist with a strong econometric background, which he himself used in conducting the
economic study in this case.  In Dura Automotive, the Seventh Circuit held that district courts
must pay close attention to the "specialization of modern science," Dura Automotive, 285 F.3d at
614.  Dr. Beyer's considerable experience offering expert testimony similar to that contained in
his report indicates that he possesses the specialized knowledge necessary to offer expert

(continued...)

Defendants' argument is unavailing for two reasons:  First, Defendants have not established that the opinions proffered by Dr. Beyer or the questions at the heart of the class certification dispute are questions that only an econometrician could answer. Second, even if econometrics testimony is required in this case, Dr. Beyer appears well qualified to give such testimony.  As an applied economist, Dr. Beyer has reportedly employed econometrics in numerous expert analyses. Beyer Rep. at ¶ 3; see also Beyer Dep. at 26-27 ("I use econometrics frequently, as do most micro-economists who are doing empirical work.").

Defendants also attack Dr. Beyer's qualifications on the basis that his testimony has been excluded in certain prior cases.  E.g., Blue Cross and Blue Shield of Wisc. v. Marshfield Clinic, 152 F.3d 588, 593 (7th Cir. 1998); Schwab v. Philip Morris USA, Inc., 2005 WL 2401647, at *3-4 (E.D.N.Y. Sept. 29, 2005) (excluding Dr. Beyer's expert testimony under Daubert and referring to it as "inconsistent with common sense and the evidence generally"); In re Catfish Antitrust Litigation, 939 F.Supp. 493, 498 (N.D. Miss. 1996) (noting "serious concerns about the admissibility of Dr. Beyer's testimony because of the apparent novelty of his economic theories in light of the dictates of Daubert"); In re Agricultural Chemicals Antitrust Litigation, 1995 WL 787538, at *10 (N.D. Fla. Oct. 23, 1995) (concluding that Dr. Beyer's testimony "ignore[d] market place realities and failed to consider the individual analysis needed to support an overcharge claim").

---

[11](...continued)
opinions related to class certification in this lawsuit.

In advancing this argument, Defendants ignore the many more relevant cases in which courts have accepted the methodologies proposed by Dr. Beyer as appropriate for assessing common impact and damages in a class action.  See, e.g. In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation, 256 F.R.D. 82 (D. Conn.2009); Behrend v. Comcast Corp., 245 F.R.D. 195, 211 (E.D. Pa. 2007); In re Polyester Staple Antitrust Litig., 2007 WL 2111380 (W.D.N.C. July 19, 2007); In re Carbon Black Antitrust Litig., 2005 WL 102966, at *21 (D. Mass. 2005).  One court concluded that Dr. Beyer "effectively utilized supporting data, including charts and exhibits, to authenticate [his] professional opinions that all class members would incur such damages."  In re Linerboard Antitrust Litig., 305 F.3d 145, 153-55 (3d Cir. 2002).  Another court "found Dr. Beyer's testimony highly credible and convincing."  In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 690-91, n.16 (N.D. Ga. 1991).  This same court described Dr. Beyer as "a well-qualified economic expert who, after review of the industry, has presented valid statistical methodologies for proving that each class member was, in fact, injured." Id.  Another court concluded, in certifying a class action: "[T]he court finds that Dr. Beyer's report is admissible. Dr. Beyer possesses extensive education and experience in the field of economics."  Midwestern Machinery, 211 F.R.D. 562 (citations omitted).  The opinions and methodologies Dr. Beyer offered in these cases, which were found acceptable under Daubert standards, are similar to the opinions and methodologies he offers here.

We are persuaded that Dr. Beyer will be capable of providing, as he has in prior,

19

similar cases, reliable evidence relating to class certification issues.  For these reasons, we hold that Dr. Beyer qualifies as an expert witness under Rule 702 and <u>Daubert</u> and shall be permitted to provide to the Court for its consideration the testimony proffered in his original report.

*B.  The Reliability of Dr. Beyer's Testimony*

Even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in <u>Daubert</u>." <u>Clark v. Takata Corp.</u>, 192 F.3d 750, 759 n.5 (7th Cir. 1999).  The testimony of a "well credentialed expert who employs an undisclosed methodology" or who offers opinions lacking "analytically sound bases" must be excluded.  <u>Tuf Racing Products, Inc. v. American Suzuki Motor Corp.</u>, 223 F.3d 585, 591 (7th Cir. 2000).  Thus, although the Court's role does not include an assessment of the credibility or persuasiveness of the proffered testimony, which factual issues are left for the jury to determine, <u>Deputy v. Lehman Brother's, Inc.</u>, 345 F.3d 494, 506 (7th Cir. 2003), the Court, "in its role as a gate-keeper," must nonetheless determine if Dr. Beyer's opinions are based on reliable methodology, and whether they would be helpful to a jury.  <u>Winters v. Fru-Con, Inc.</u>, 498 F.3d 734, 743 (7th Cir. 2007).

Defendants' first challenge to Dr. Beyer's report is that his "promise of a future expert to develop a model at some future time using unknown and as yet undesignated

variables and measures . . . is inadmissible under" Rule 702.  Builders Def.'s Br. in Supp.

at 22.  In assessing an expert's methodology, the Court "must rule out subjective belief or

unsupported speculation." Deimer v. Cincinnati Sub-Zero Prods, Inc., 58 F.3d 341, 344

(7th Cir. 1995) (internal citations omitted).

On the other hand, when an expert's proffered methodology "enjoys general

acceptance in the relevant scientific community," that opinion is usually deemed reliable.

Srail v. Village of Lisle, 249 F.R.D. 544, 563 (N.D. Ill. 2008); see also United States v.

Havvard, 260 F.3d 597, 600-601 (7th Cir. 2001) (noting that *Daubert* did not replace the

"general acceptance" test and Daubert's reliability prong was easily met where expert's

methodology boasted "100 years of successful use").  In his report and deposition

testimony, Dr. Beyer proposed an analytical model for his assessment of class-wide

impact: "I mentioned in my report . . . a fixed effects component to the multiple

regression analysis is possible."  Dep. of Beyer at 235-236.

We are informed that Dr. Beyer's "proposed methodology, namely regression

analysis, and antitrust principles are widely recognized within the field of economics and

have been accepted by courts." Midwestern Machinery, 211 F.R.D. 562.  And,

significantly, Defendants' experts admit that these methods are deemed generally reliable.

Indeed, according to one such expert, "[t]here is little debate about the general

applicability of the use of techniques such as regression analysis, to estimate damages in

cases like this."  Marshall Report at ¶ 104 (noting also that his partner at a consulting firm

used regression analysis to determine the common impact in another antitrust case).

Because Dr. Beyer's methodology is widely accepted, we find that it satisfies the requirements under Daubert for class certification purposes.  See Srail, 249 F.R.D. at 563; see also EPDM, 256 F.R.D. 82; Lumco Indus., Inc. v. Jeld-Wen, Inc., 171 F.R.D. 168, 174 (E.D. Pa. 1997).

Defendants also challenge Dr. Beyer's opinions as relying on untested assumptions.  An expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence.  See Elcock v. Kmart Corp., 233 F.3d 734, 756 (3d Cir. 2000) (reversing district court's admission of expert economic damages testimony relying on empirical assumptions unsupported by the record).  Specifically, Defendants contend that Dr. Beyer incorrectly assumes that: (1) ready-mixed concrete is an undifferentiated product; (2) "customers primarily chose their suppliers of ready-mixed concrete on the basis of price," Beyer Report at ¶¶ 10, 22;  and (3) no Defendant could command a price premium on the product.

Having reviewed Dr. Beyer's analyses, it is clear that he does not assume these facts without any basis; he concludes that they exist based on his review of other facts.  Defendants present much evidence in an effort to contradict these conclusions, but it is not pertinent to our Daubert examination.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 508 U.S. at 595; see also Smith, 215 F.3d at 718-719 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions

based on that analysis are factual matters to be determined by the trier of fact.").[12]  Unlike cases in which an expert makes assumptions contrary to the evidence, see Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992), Dr. Beyer's general conclusions about the price-fixing activities of Defendants are, in fact, supported by the record.  We find that Dr. Beyer has proposed a reliable method for showing common impact and damages to the class and that his opinions therefore meet the Daubert standard of admissibility.  See Fedex, 2007 WL 3027405, at *4.

Accordingly, Dr. Beyer is qualified to provide the specific expert testimony he has proffered, and his methodology is sufficiently reliable to permit it to be considered for class certification purposes.  Defendants' Motions to Exclude his report and testimony must therefore be denied.

### III.  Plaintiffs' Motion to Exclude

Plaintiffs seek to exclude specific portions of the report and testimony of John R. Umbeck, Ph.D.  According to Plaintiffs, "the methodology Dr. Umbeck applied in comparing *gross* prices with *net* prices is plainly unscientific, unreliable, and not helpful to the trier of fact."  Pl.'s Br. in Supp. at 2.  Plaintiffs illustrate the defect in Umbeck's

---

[12]Defendants also attack Dr. Beyer's "indexing" analysis.  Rather than evaluating the actual prices charged by each Defendant to ascertain proof of price fixing, Dr. Beyer compares "indexed" prices that he created.  Defendants worry that Dr. Beyer will use this index to show that all Defendants always charged the same prices but Plaintiffs insist that his opinions related to the index are only offered in support of the conclusion that prices moved similarly over time. Defendants do not strongly oppose the latter analysis on Daubert grounds.  We accept Plaintiffs' assurance that the index is offered only for this purpose and shall consider it in that context.

calculation using the following analogy: "If store A records its prices before accounting for store coupons (i.e., *gross* prices), and Store B records its prices after deducting for the use of store coupons (i.s., *net* prices), it is common sense that a raw comparison of price data will likely indicate that Store A appears to be able to obtain a price premium compared to store B." Id.

Despite the straightforward logic of their example, Plaintiffs' contention that Dr. Umbeck incorrectly compared net and gross profits is actually nothing more than a factual dispute, which forecloses a Daubert inquiry. See Smith, 215 F.3d at 718-719. Briefly stated, the parties dispute what comprises the purchase prices, which often depend on a number of terms, such as incentives for early payment, charges for late payments, and credit offered. In their challenge to Dr. Umbeck's report, Plaintiffs contend that he failed to account for these variables, thus rendering his opinions unreliable. Defendants acknowledge that these terms affect the purchaser's decision and the agreed-upon price, but emphasize that "plaintiffs' and Beyer's talk about gross, net and making conversions, etc - don't change the price, the price is the price." Def.'s Response at 9. According to Defendants, any discounts offered, such as the early-pay discount, were available only after the customer and the supplier agreed upon a given price. It is obvious that the nature of the parties' dispute in this regard is essentially factual, and therefore not susceptible to a Daubert analysis. See Deputy, 345 F.3d at 506.[13] Plaintiffs' Motion to Strike shall

---

[13]Further undermining Plaintiffs' motion is the fact that Dr. Umbeck's report relies upon
(continued...)

therefore be denied.

### IV.  *Motion to Certify Class*

Having pared away the various preliminary disputes, we finally reach the central

issue presented by the parties:  whether Plaintiffs' purported class should be certified.  A

class is appropriate for certification only if it meets the four prerequisites to a class action

set out in Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and

adequacy of representation.  Fed.R.Civ.P. 23(a).  Once this hurdle is cleared, the court

must ensure that the proposed class satisfies one of the three categories established by

Rule 23(b).  Here, Plaintiffs contend that the class is maintainable under Rule 23(b)(3),

which examines whether common questions of law or fact predominate over questions

affecting individual members of the class and whether a class action is a superior method

for resolving the controversy.  See In Re Bromine Antitrust Litig., 203 F.R.D. 403, 407

(S.D. Ind. 2001).

When deciding whether to certify a class, the appellate court guidance set forth in

Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001), controls the degree to

which we examine the evidence submitted on the issue.  In Szabo, the Seventh Circuit

chastised the district court for having accepted the allegations of the complaint as true in

---

[13](...continued)
the very same data contained in Figures 7 through 11 of Dr. Beyer's original report.  Because Dr.
Umbeck limited his analysis of this data to critiquing what he saw as Dr. Beyer's methods and
conclusions, his reliance on this data does not render his opinions inadmissible.

deciding whether to certify a class.  249 F.3d at 675 ("The proposition that a district judge

must accept all of the complaint's allegations when deciding whether to certify a class

cannot be found in Rule 23 and has nothing to recommend it.").  Instead, a district court

must "make whatever factual and legal inquiries are necessary under Rule 23."  Id. at 676.

At the certification stage, "[t]ough questions must be faced and squarely decided,

if necessary by . . . choosing between competing perspectives."  West v. Prudential

Securities, Inc., 282 F.3d 935, 938 (7th Cir. 2002).[14]  Accordingly, consistent with Szabo

and West, we shall assess evidence and resolve disputes pertaining to class certification

even when that means "mak[ing] a preliminary inquiry into the merits."  Szabo, 249 F.3d

at 676.

*A.  Requirements of Rule 23(a)*

1. Numerosity

To satisfy the  numerosity requirement, the class must be so large that joinder of

all parties would be impracticable.  Fed.R.Civ.P. 23(a)(1).  The class proposed by

Plaintiffs, which includes "[a]ll individuals, partnerships, corporations, limited liability

companies, or other business or legal entities who purchased ready-mixed concrete

directly from any of the defendants," numbers potentially in the thousands.  See Compl.

¶¶ 4, 37, 45-55, 61.  Such a class clearly satisfies the numerosity requirement of Rule

---

[14]In West, the court stressed that district courts must refrain from allowing plaintiffs to
"obtain class certification just by hiring a competent expert."  282 F.3d at 938.

23(a).  Hubler Chevrolet, Inc. v. General Motors Corp., 193 F.R.D. 574, 577 (S.D. Ind.

2000) (certifying class numbering 200 members); Scholes v. Stone, McGuire &

Benjamin, 143 F.R.D. 181, 184 (N.D. Ill. 1992) (approving class consisting of 129-300

geographically dispersed members).  Defendants focus little of their argument against

class certification on the numerosity of the proposed class.  Thus, based upon our

"preliminary inquiry into the merits," which supports Plaintiffs' assertion that the

proposed class numbers in the thousands, we hold that the numerosity requirement of

Rule 23(a) is satisfied.


2. Commonality

       To maintain a class action, there must be questions of law or fact common to the

class.  Fed.R.Civ.P. 23(a)(2).  The commonality requirement is ordinarily satisfied when

there is "a common nucleus of operative facts."  Rosario v. Livaditis, 963 F.2d 1013,

1018 (7th Cir. 1992).  As this court noted in Hubler:

> Commonality does not require that all questions of fact or law be identical.
> See Johns v. De Leonardis, 145 F.R.D. 480, 483 (N.D. Ill. 1992).  Factual
> variation among class grievances does not defeat a finding of commonality.
> See Rosario, 963 F.2d at 1017.  Rather, this requirement is satisfied as long as
> "the class claims arise out of the same legal or remedial theory," Johns, 145
> F.R.D. at 483.  It is enough to satisfy commonality that there be a "common
> question . . . at the heart of the case."  Rosario, 963 F.2d at 1018.

Hubler, 193 F.R.D. at 577.

       Plaintiffs contend that the commonality requirement is satisfied by the following

common questions of law and fact: whether Defendants engaged in a conspiracy; whether

27

Defendants violated the antitrust laws; whether Defendants took steps to conceal the conspiracy; and whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the class and, if so, the appropriate damages.  Other district courts within our circuit have held that "the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class."  Sebo v. Rubenstein, 188 F.R.D. 310, 313 (N.D. Ill. 1999).  We find their guidance helpful and illuminating.

In our case, as in many antitrust cases, commonality is satisfied because Plaintiffs "have a shared interest in attempting to prove that Defendants engaged in a conspiracy to fix, raise, and maintain the prices" of the product.  In re Foundry Resins Antitrust Litig., 242 F.R.D. 393, 405 (S.D. Ohio 2007).  Plaintiffs' fraudulent concealment and conspiracy allegations further support a finding of commonality in this case.  See In re Infant Formula Antitrust Litig., 1992 WL 503465, at *4 (N.D. Fla. Jan. 13, 1992) ("A pattern of deception, as part of an alleged conspiracy, certainly raises common questions of law and fact regarding all class members.").

Because common questions of law and fact exist as to and among each member of the putative class, we find that the defined class satisfies the commonality requirement of Rule 23(a)(2).

3.  Typicality

Rule 23(a) further requires that "the claims . . . of the representative parties are

typical of the claims of the class." Fed.R.Civ.P. 23(a)(3). This requirement is satisfied where the named plaintiffs' claims "arise[] from the same . . . practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through pursuit of their own goals." In re Prudential Ins. Co. of Amer. Sales Practices Litig., 148 F.3d 283, 311 (3d Cir. 1998). For this reason, "the representatives' claims need not be identical to the class members'; rather, it is sufficient if they are substantially similar." Ruiz v. Stewart Associates, Inc., 171 F.R.D. 238, 242 (N.D. Ill. 1997).

Here, Plaintiffs argue that typicality is satisfied because the representative Plaintiffs as well as the other class members all claim that they were injured by Defendants' price-fixing conspiracy because they all: purchased ready-mixed concrete directly from Defendants; paid supra-competitive prices; allege an antitrust violation in relation to those purchases; and seek relief under §§ 4 and 16 of the Clayton Act. "Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants." Estate of Jim Garrison v. Warner Brothers et al., 1996 WL 407849, at *2 (C.D. Cal. June 25, 1996).

Variations in the level of market participation among plaintiffs and the class do not defeat typicality: "the various products purchased and the different amount of damages sustained by individual plaintiffs do not negate a finding of typicality, provided the cause

of those injuries arises from a common wrong." Carbon Black, 2005 WL 102966, at *12

(quoting In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 480 (W.D. Pa. 1999)).  The

Carbon Black court reasoned that the "overarching scheme [was] the linchpin of

plaintiffs' amended complaint, regardless of the product purchased, the market involved

or the price ultimately paid."  Id.; see also In re Vitamins Antitrust Litig., 209 F.R.D. 251,

261 (D.D.C. 2002) ("The typicality requirement does not mandate that products

purchased, methods of purchase, or even damages of the named plaintiffs must be the

same as those of the absent class members.").  "[I]f the named class members' claims are

based on the same legal theory or arise from the same course of conduct, factual

differences in date, size, manner, or conditions of purchase, the type of purchaser, or

other concerns do not make named plaintiffs atypical."  Foundry Resins, 242 F.R.D. at

406.

 Here, representative Plaintiffs' claims and the claims of the purported class are

based on the same antitrust theory and arise from the same allegations of conspiracy.

Therefore, the typicality requirement is satisfied in this case.


4.  Adequacy of Representation

 The named representatives must "fairly and adequately protect the interests of the

class."  Fed.R.Civ.P. 23(a)(4).  The adequacy standard involves two elements: one relates

to the adequacy of the named plaintiffs' representation of the class and requires that there

be no conflict between the interests of the representative and those of the class in general;

the other relates to the adequacy of class counsel's representation.  Susman v. Lincoln American Corp., 561 F.2d 86, 90 (7th Cir. 1977).

Plaintiffs contend that the first element is met because neither actual nor potential conflicts of interest exist between the representatives and other members of the class. Each representative, and each class member, has alleged an antitrust injury resulting from Defendants' conspiracy, and each has an interest in demonstrating Defendants' liability as well as in recovering under the antitrust laws.  This satisfies the first prong of the adequacy element.  See, e.g., Tableware, 241 F.R.D. 644, 649 (N.D. Cal. 2007) (holding that Rule 23(a)(4) was satisfied because "[m]embers of the class were allegedly overcharged for tableware and have a mutual and coterminous interest in establishing defendants' liability and in recovering damages" in common with the representative plaintiffs.").

The second element of adequacy is also satisfied.  Plaintiffs have engaged in regular communication with Interim Co-Lead Counsel, including cooperating and assisting with this litigation and responding to Defendants' interrogatories.  Therefore, the adequacy requirement of Rule 23(a) is satisfied in this case.

## B.  Requirements of Rule 23(b)(3)

Having determined that the class certification requirements of Rule 23(a) have been met, we now examine whether the criteria set forth in Rule 23(b) have been satisfied.  Plaintiffs assert suitability for class certification under Rule 23(b)(3), which

31

requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b)(3).

### 1.  Predominance of Common Issues

Common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." Bromine, 203 F.R.D. at 407 (citations omitted).  Rule 23(b)'s predominance inquiry is more demanding than Rule 23(a)'s commonality requirement.  Wahl v. Midland Credit Management, Inc., 243 F.R.D. 291 (N.D. Ill. 2007).  Here, "Plaintiffs must establish that the common questions of law or fact predominate with respect to the elements of their antitrust violation claims."  Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd., 1999 WL 342392, at *5 (N.D. Ill. May 14, 1999).  Accordingly, Plaintiffs "will have to prove the existence of the alleged price-fixing conspiracy, that the members of the class were injured in their business or property by reason of that conspiracy (the 'impact' question), and the amount of their damages."  In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 165-66 (S.D.N.Y. 2000).

a.  Existence of the Conspiracy

We are satisfied that the first requirement has been met in this case.  Plaintiffs

allege a single conspiracy involving the illegal fixing of prices of ready-mixed concrete products in the Central Indiana area.  "The weight of authority in antitrust cases indicates that the existence of a conspiracy in restraint of trade is [an issue] that is common to all potential plaintiffs."  Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 336 (N.D. Ill. 1997).  Although Defendants contend that the question of impact is too individualized to warrant class certification, the common question of the existence of a horizontal price-fixing conspiracy usually satisfies Rule 23(b)(3).  See Auction Houses, 193 F.R.D. at 166; In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

Moreover, the existence of the conspiracy is supported by the guilty pleas and convictions that arose from the criminal antitrust prosecutions of Defendants prior to the inception of this civil case.  The related procedure pertaining to those pleas and convictions indicates as follows:  On June 29, 2005, the United States Department of Justice announced that IMI had agreed to plead guilty of conspiring to fix and fixing the price of ready-mixed concrete; on March 30, 2006, Builder's pleaded guilty to similar price fixing charges; and, on November 16, 2006, a jury convicted Ricky Beaver, Chris Beaver, and MA-RI-AL Corporation d/b/a Beaver Materials of conspiracy to violate the Sherman Act.[15]  Although the record and the substantive law support Plaintiffs' contention that the existence of the conspiracy is a question common to all Plaintiffs, in

---

[15]The elements required to prove a criminal violation of § 1 of the Sherman Act and to prove a claim for damages under § 4(a) of the Clayton Act differ.  While criminal convictions may rest solely on a § 1 violation, an agreement in restraint of trade, § 4 requires the additional showing of standing, causation/impact, and antitrust injury.  Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341 (1990).

order to satisfy 23(b)(3) fully, Plaintiffs must also cite evidence that demonstrates the harmful impact resulting from these violations.

b.  Impact

Plaintiffs allege that Defendants' conspiracy to raise the price of ready-mixed concrete products above competitive levels had a common impact upon all members of the class.  Many courts apply the "general rule" that "an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."  In re Alcoholic Beverages Litig., 95 F.R.D. 321, 327 (S.D.N.Y. 1982); see also Foundry Resins, 242 F.R.D. at 409 ("Courts have generally found that when parties succeed in conspiring to fix prices, everyone who purchases the relevant goods or services [is] invariably injured").  However, "[a]ntitrust defendants are free to argue, as many of them do, that their cases are exceptional because too many variables enter into setting prices in their industries to permit common proof of impact."  Industrial Diamonds, 167 F.R.D. at 382.  Following the lead of the courts in Industrial Diamonds and Carbon Black, we also choose not to rely solely upon the automatic presumption, though we recognize that "the reasoning behind its application by some courts - namely, that an overarching price-fixing conspiracy likely has an impact on all purchasers - informs the analysis of the Rule 23(b)(3) requirement."  Carbon Black, 2005 WL 102966, at *15.

i.  Expert Analysis of Impact

Defendants contend, based on the analyses of their experts, that the ready-mixed concrete market is too varied to permit common proof of impact.  "In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof."  In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008); see also Blades v. Monsanto Co., 400 F.3d 562, 572 (8th Cir. 2005) (holding that "proof of conspiracy is not proof of common injury").

Specifically, Defendants' expert, Dr. Umbeck, asserts that concrete is not an undifferentiated product but rather comes in "over 1,000 different mixes . . . each with its own particular set of characteristics."  Umbeck Rep. at 13; see also Marshall Rep. at ¶ 24.  According to Defendants, this differentiation makes the common proof necessary for a class action impossible to establish.  Moreover, Defendants' experts conclude that common proof of impact is impossible because class members negotiated individual prices for the concrete they purchased.  Marshall Rep. at ¶ 50.  Dr. Marshall's analysis also led him to conclude that purchasers of ready-made concrete considered a wide variety of factors, not just price, when choosing which concrete supplier to use.  Marshall Rep. ¶ 36.  Finally, Defendants' experts testified that the Central Indiana area is comprised of distinct product and geographic markets.  See Aff. of Hausman at ¶ 29; Umbeck Rep. at ¶ 18-29; Marshall Rep. at ¶ 31-58.  If Defendants' experts are correct, these variables present substantial obstacles to Plaintiffs' ability to prove a common

impact.

Plaintiffs' expert, Dr. Beyer, opines that common proof is, in fact, possible. Based on the data in the record, Dr. Beyer concludes that Defendants sold ready-mixed concrete that was commercially interchangeable, the effect of which fact diminishes the significance of product differentiation. Dr. Beyer also maintains that geographic proximity and overlap in the Central Indiana area ensured that Defendants held market power jointly. He asserts that numerous barriers to entry existed in the Central Indiana concrete market, which impaired competition. He also concludes that no economic substitutes for ready-mixed concrete existed, thereby removing class members' ability to avoid inflated prices. E.g., Beyer Rep. ¶¶ 10, 22-26, 46. If Dr. Beyer's testimony prevails, Plaintiffs will likely be able to establish the required common proof of impact and damages. See Carbon Black, 2005 WL 102966, at *15.

Defendants urge us to undertake to resolve a "battle of experts" at the class certification stage in determining if common proof of impact has been established in this case. "In essence, the defendants are asking the court to determine which multiple regression model is *most* accurate, which is ultimately a merits decision." EPDM, 256 F.R.D. at 101. The "factual and legal inquiries" required pursuant to Szabo and West do not necessitate a determination of which expert is more credible. In re Sulfuric Acid Antitrust Litig., 2007 WL 898600, at *8 (N.D. Ill. Mar. 21, 2007) (holding that class certification is not "the right time to engage in a 'battle of experts'"). "The real question before this court is whether the plaintiffs have established a *workable* multiple regression

36

equation, not whether plaintiffs' model actually *works*."  EPDM, 256 F.R.D. at 101.

From our review of the models proposed by the experts, we conclude that Defendants

have not "successfully debunked the plaintiffs' claim that a class-wide approach can be

used to prove impact and damages."  Id. at 96.  Therefore, the expert testimony placed

before the Court suffices to convince us that Plaintiffs have successfully carried their

burden under Rule 23(b).


ii.  Further Evidence that Common Proof is Possible

Plaintiffs have also provided sufficient non-expert factual evidence to establish the

common proof of impact of the alleged conspiracy on the class.  Plaintiffs first point to

evidence contradicting Defendants' contention that ready-mixed concrete is a

differentiated product.   In his deposition, Builder's employee Scott Hall, a certified

quality control specialist, explained the ways in which standards set by the American

Society for Testing and Materials ensure the conformity of concrete from one

manufacturer to another.  Dep. of Hall [Pl.'s Exhibit 54].  Hall testified that these

standards were almost always met by each of the Defendants.  Thus, the evidence

arguably shows that the concrete which is the subject of the present case was, in fact, an

undifferentiated product.  See id. at 50-53.[16]

---

[16]Even if ready-made concrete is actually comprised of many different products, as
Defendants urge, a wide range of products and prices does not make it impossible to use
common proof to demonstrate impact.  In re Bromine, 203 F.R.D. at 414 (citing Industrial
Diamonds, 167 F.R.D. at 383 (certifying class even though more than 8,000 industrial diamond
(continued...)

Plaintiffs also sufficiently rebut Defendants' contention that individual negotiations prevent common proof.  Essentially, Defendants' contend that common proof is impossible because the question of impact would "devolve any class trial into a series of mini-trials" as to each plaintiff.  Bromine, 203 F.R.D. at 415.  In Bromine, this Court rejected this specific argument: "Despite 'individual price negotiations, plaintiffs may succeed in showing classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised . . . by the collusive actions of the defendants." Id. (quoting In re Commercial Tissue Products, 183 F.R.D. 589, 595 (N.D. Fla. 1998).

A number of courts have certified classes despite evidence of individual negotiations and product variations "where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began." See In re Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 383 (S.D.N.Y. 1996); see also, e.g., In re Potash Antitrust Litig., 159 F.R.D. 682 (D. Minn. 1995); Domestic Air Transp., 137 F.R.D. 677.  These courts have accepted, at the class certification stage, the theory that "the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market." Id.  For purposes of the impact determination, courts relied on the fact that

---

[16](...continued)
products were for sale during proposed class period and several product "families" were in wide range of industrial diamond products)).

"[t]he allegedly agreed rate schedules probably raised the base from which the negotiations began and may well have resulted in individually negotiated buyer's premiums, to the extent they existed, higher than would have been agreed upon in the absence of the conspiracy."  <u>Auction Houses</u>, 193 F.R.D. at 166.

Here, it is clear that Plaintiffs intend to prove at trial that Defendants conspired to set artificially high list prices.  Plaintiffs have adduced numerous price lists along with evidence that Defendants kept track of their competitors' price lists.  <u>See</u> Levin Reply Dec. [Docket No. 675] (Exhibits 68, 72, 73, 74, and 75); Dep. of R. Beaver at 79-80; Dep. of P. Irving at 311.[17]  These price lists make it possible for Plaintiffs to show that concrete prices depended upon the price-fixing agreements evident therein.  "If the plaintiffs prove that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury."  <u>Carbon Black</u>, 2005 WL 102966, at *16; <u>see also</u> <u>NASDAQ</u>, 169 F.R.D. at 523 ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally.").   We are persuaded, despite the potential diversity of the ready-mixed concrete market in Central Indiana, that common proof of impact is possible because of the direct evidence of price-fixing contained in Defendants' price lists.  <u>See</u>

---

[17]Although Defendants successfully requested that Plaintiffs' briefs and expert reports of October 8, 2008, be stricken, they did not request the exclusion of the evidence filed on that date, much of which is in the record elsewhere.  Because there is no reason to strike this evidence, it has been factored into our consideration of the class certification issues.

Bromine, 203 F.R.D. at 414 ("Paying unstable prices that are higher than they would have
been absent a conspiracy constitutes an antitrust injury" that is subject to common proof.).

Plaintiffs have alleged that Defendants' conspiracy inflated the prices paid by all
purchasers of ready-mixed concrete.  Plaintiffs have referred to list price changes, the
opinions of Dr. Beyer regarding the price structure of ready-mixed concrete in the Central
Indiana area, the testimony of Defendants' employees, and numerous meetings between
Defendants at which they discussed and entered into specific agreements to fix prices.
This evidence goes far beyond mere allegations in a complaint.  See Szabo, 249 F.3d at
676.[18]  Based on this evidence, Plaintiffs have successfully demonstrated with sufficient
certainty that those who purchased ready-mixed concrete within the class period suffered
damages as a result of an ongoing conspiracy to maintain inflated prices.  See EPDM, 256
F.R.D. at 90.[19]

_____

[18]Given the extent of this evidence, regardless of the efficacy of Dr. Beyer's modeling to
show impact and damages, Plaintiffs have demonstrated how common proof may be shown
through other evidence in the record.  Furthermore, common questions predominate because of
the common facts essential to the proof in this case: "even if each Class Member . . . were to
bring suit individually, each plaintiff would have to allege and prove virtually identical facts."
In re Merrill Lynch & Co. Research Reports Sec. Litig., 246 F.R.D. 156, 165 (S.D.N.Y. 2007);
see also EPDM, 256 F.R.D. at 103.

[19]Also supporting Plaintiffs' showing of impact is Defendants' refusal to testify as to
certain aspects of the conspiracy on Fifth Amendment grounds.  IMI and Beaver Defendants
have refused, at least in part, to testify or participate in discovery concerning aspects of the
conspiracy, a fact that gives rise to a negative inference against Defendants as to the existence
and impact of a conspiracy.   Davis v. Northside Realty Associates, Inc., 95 F.R.D. 39, 40, 45
(N.D. Ga. 1982); see also In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 663
(7th Cir. 2002) (holding that the "general rule is that an adverse inference may be drawn from [a
refusal to testify on the grounds of self-incrimination] in a civil case").

3.  Damages

The question of how much each class member was damaged by the alleged conspiracy is a separate issue from the question of overall impact on the class. Defendants contend, once again, that individual negotiations and product differentiation will make any damages calculation too individualized.  "Courts have routinely held, however, that the need for individualized determinations of the putative class members' damages does not, without more, preclude certification of a class under Rule 23(b)(3)." Industrial Diamonds, 167 F.R.D. at 382; see also McLaughlin v. American Tobacco Co., 522 F.3d 215, 231 (2d Cir. 2008); Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir. 2001) ("Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue.").

Furthermore, Rule 23(b)(3) is satisfied if a method for analyzing the evidence to show individual impact has been identified.  See Flat Glass, 191 F.R.D. at 486-487; Lumco Indus., 171 F.R.D. at 174 ("[A]t this point, . . . plaintiffs are not required to come forward with more specific formulas for calculating damages[,] as the proposed methodologies have been accepted by courts in similar class actions").  Dr. Beyer points to a generally accepted method for proving the impact Plaintiffs' hope to show. Defendants' experts, Dr. Marshall and Dr. Hausman, confirm that the regression analysis Dr. Beyer refers to may be used for measuring the impact of price-fixing.  Dep. of Marshall at 141; Dep. of Hausman at 138; see also Midwestern Machinery, 211 F.R.D.

562.  Recognizing that "[n]o precise damage formula is needed at the certification stage of an antitrust action" and that "the court's inquiry is limited to whether the proposed methods are so unsubstantial as to amount to method at all," Paper Systems Inc. v. Mitsubishi Corp., 193 F.R.D. 601, 615 (E.D. Wis. 2000), we conclude that Plaintiffs have sufficiently demonstrated their ability to show common proof of damages at trial.

**2. Superiority**

The final question under a Rule 23 analysis involves superiority.  Rule 23(b)(3) requires, in order for a class to be certified, "that class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).  To determine whether a class action is superior to trying cases separately, courts look to four factors: (1) the interest of class members in individually controlling the litigation; (2) the extent to which litigation already has been commenced by other members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the management difficulties likely to be encountered.  Id.  All of these factors are satisfied here.

When "common questions are found to predominate, then courts also generally have ruled that the second prerequisite of Rule 23(b)(3) - that the class suit be superior to any other available means of settling the controversy - is satisfied in the context of an antitrust action."  Carbon Black, 2005 WL 102966, at *21.  As other courts have noted, when a "case appears at this stage to involve large numbers of defendants' customers who

42

allegedly were overcharged pursuant to a common scheme," a class action is the superior method of litigation.  Auction Houses, 193 F.R.D. at 168.  While there will undoubtedly be some individual matters that will complicate manageability, common issues nonetheless predominate.  Proceeding with a class action will, in the end, conserve judicial resources, in comparison to numerous individual trials.  See In re Bromine, 203 F.R.D. at 416 (citing In re Brand Name Prescription Drugs, 1994 WL 663590, at *6 (N.D. Ill. Nov. 18, 1994)).

## V. Conclusion

For the reasons set forth above, Plaintiffs' Motion to Certify Class is GRANTED; IMI Defendants' Motion to Exclude is DENIED; Builder's Motion to Exclude is DENIED; Plaintiffs' Motion to Strike is DENIED; and Defendants' Motion to Strike is GRANTED.

IT IS SO ORDERED.

Date:  09/09/2009

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Anthony Parker Aaron
ICE MILLER LLP
anthony.aaron@icemiller.com

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Steven A. Asher
WEINSTEIN KITCHENOFF &
ASHER, LLC
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103

43

Bryan Harold Babb
BOSE MCKINNEY & EVANS, LLP
bbabb@boselaw.com

Steven M. Badger
BOSE MCKINNEY & EVANS, LLP
sbadger@boselaw.com

Barry C. Barnett
SUSMAN GODFREY LLP
bbarnett@susmangodfrey.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO
LLP
steve@hbsslaw.com

Robert J. Bonsignore
BONSIGNORE & BREWER
rbonsignore@bandblaw.net

Michael Wesley Boomgarden
UNITED STATES DEPARTMENT OF
JUSTICE
michael.boomgarden@usdoj.gov

Jonathan  Bridges
SUSMAN GODFREY LLP
jbridges@susmangodfrey.com

W. Joseph Bruckner
LOCKRIDGE GRINDAL NAUEN
PLLP
wjbruckner@locklaw.com

James A.L. Buddenbaum
PARR RICHEY OBREMSKEY
FRANDSEN & PATTERSON
LLP-Lebanon
jbuddenbaum@parrlaw.com

David Michael Bullington
HOPPER & BLACKWELL
dbullington@hopperblackwell.com

Jason R. Burke
HOPPER & BLACKWELL
jburke@hopperblackwell.com

Warren T. Burns
SUSMAN GODFREY LLP
wburns@susmangodfrey.com

David C. Campbell
BINGHAM MCHALE LLP
dcampbell@binghammchale.com

Abigail B. Cella
ICE MILLER LLP
abby.cella@icemiller.com

Samuel K. Charnoff
ARENT FOX LLP
charnoff.samuel@arentfox.com

Wareewan Tina Charoenpong
MUNGER, TOLLES & OLSON
tina.charoenpong@mto.com

Kathleen C. Chavez
CHAVEZ LAW FIRM
416 S. Second Street
Geneva, IL 60134

Bryan L. Clobes
MILLER FAUCHER & CAFFERTY
LLP
bclobes@millerfaucher.com

Jay S. Cohen
SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.
jcohen@srkw-law.com

Stephen E. Connolly
SCHIFFRIN & BARROWAY LLP
sconnolly@faruqilaw.com

Jeffrey J. Corrigan
SPECTOR ROSEMAN KODROFF &
WILLIS P.C.
jcorrigan@srk-law.com

Isaac Lee Diel
LAW OFFICES OF ISAAC L. DIEL
dslawkc@aol.com

Jonathan Asher Epstein
UNITED STATES DEPARTMENT OF
JUSTICE
jonathan.epstein@usdoj.gov

Vincent J. Esades
HEINS MILLS & OLSON
vesades@heinsmills.com

Yvonne M. Flaherty
LOCKRIDGE GRINDAL NAUEN
PLLP
ymflaherty@locklaw.com

Robert  Foote
FOOTE MEYERS MIELKE &
FLOWERS, LLC
416 S. Second Street
Geneva, IL 60134

Joshua Allen Fowkes
ARENT FOX LLP
fowkes.joshua@arentfox.com

Lisa Jean Frisella
THE MOGIN LAW FIRM
dmogin@moginlaw.com

Jerry Avan Garau
FINDLING GARAU GERMANO &
PENNINGTON
jgarau@gghplaw.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Thomas J. Grau
DREWRY SIMMONS VORNEHM,
LLP
tgrau@drewrysimmons.com

Mark Kevin Gray
GRAY & WHITE
mkgrayatty@aol.com

Betsy Katherine Greene
GREENE & SCHULTZ
bkgreene@kiva.net

Abram B. Gregory
TAFT STETTINIUS & HOLLISTER
LLP
agregory@taftlaw.com

Geoffrey Mitchell Grodner
MALLOR CLENDENING GRODNER
& BOHRER
gmgrodne@mcgb.com

Theresa Lee Groh
MURDOCK GOLDENBERG
SCHNEIDER & GROH LPA
tgroh@mgsglaw.com

Marshall S. Hanley
FINDLING GARAU GERMANO &
PENNINGTON
mhanley@gghplaw.com

Gregory P. Hansel
PRETI FLAHERTY BELIVEAU
PACHIOS & HALEY LLP
ghansel@preti.com

Edward Wesley Harris III
TAFT STETTINIUS & HOLLISTER
LLP
eharris@taftlaw.com

Samuel D. Heins
HEINS MILLS & OLSON PLC
sheins@heinsmills.com

William E. Hoese
KOHN SWIFT & GRAF PC
whoese@kohnswift.com

George W. Hopper
HOPPER & BLACKWELL
ghopper@hopperblackwell.com

Troy Jerome Hutchinson
HIENS MILLS & OLSON
thutchinson@heinsmills.com

Michael B. Hyman
MUCH SHELIST
191 North Wacker Drive
18th Floor
Chicago, IL 60606

Curtis T. Jones
BOSE MCKINNEY & EVANS, LLP
cjones@boselaw.com

Daniel Richard Karon
GOLDMAN SCARLATO & KARON
PC
karon@gsk-law.com

G. Daniel Kelley Jr.
ICE MILLER LLP
daniel.kelley@icemiller.com

Jamie Ranah Kendall
PRICE WAICUKAUSKI & RILEY
jkendall@price-law.com

Jennifer G. Knight
CROWELL & MORING LLP
jknight@crowell.com

Jeffrey L. Kodroff
SPECTOR ROSEMAN KODROFF &
WILLIS P.C.
jkodroff@srk-law.com

Joseph C. Kohn
KOHN SWIFT & GRAF PC
jkohn@kohnswift.com

Offer  Korin
KATZ & KORIN P.C.
okorin@katzkorin.com

Briana Lynn Kovac
BINGHAM MCHALE LLP
bkovac@binghammchale.com

Gene R. Leeuw
LEEUW OBERLIES & CAMPBELL PC
gleeuw@indylegal.net

Joseph M. Leone
DREWRY SIMMONS VORNEHM,
LLP
jleone@drewrysimmons.com

Kellie Safar Lerner
LABATON SUCHAROW & RUDOFF
LLP
klerner@labaton.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Richard A. Lockridge
LOCKRIDGE GRINDAL NAUEN
PLLP
2200 Washington Square Bldg
100 Washington Ave South
Minneapolis, MN 55410

Marie L. Mathews
WEIL, GOTSHAL & MANGES
marie.mathews@weil.com

Patricia Polis McCrory
FROST BROWN TODD LLC
pmccrory@fbtlaw.com

Chad Michael McManamy
THE MOGIN LAW FIRM
chad@moginlaw.com

J. Lee McNeely
MCNEELY STEPHENSON THOPY &
HARROLD
jlmcneely@msth.com

John M. Mead
LEEUW OBERLIES & CAMPBELL PC
jmead@indylegal.net

Ellen  Meriwether
MILLER FAUCHER & CAFFERTY
LLP
One Logan Square
18th & Cherry Streets, Suite 1700
Philadelphia, PA 19103

Marvin  Miller
MILLER FAUCHER & CAFFERTY
LLP
30 North La Salle Street
Suite 3200
Chicago, IL 60602

Vess Allen Miller
COHEN & MALAD LLP
vmiller@cohenandmalad.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com

Christopher Allan Moeller
MCNALLY LAW OFFICES, s.c.
cmoeller@mcinjurylaw.com

Daniel Jay Mogin
THE MOGIN LAW FIRM
dmogin@moginlaw.com

Kenneth J. Munson
BINGHAM MCHALE LLP
kmunson@binghammchale.com

John Charles Murdock
MURDOCK GOLDENBERG
SCHNEIDER & GROH LPA
cpence@mgsglaw.com

Casandra  Murphy
BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
cmurphy@btkmc.com

Krishna B. Narine
LAW OFFICE OF KRISHNA B.
NARINE
7839 Montgomery Avenue
Elkins Park, PA 19027

Cathleen L. Nevin
KATZ & KORIN P.C.
cnevin@katzkorin.com

Patrick B. Omilian
MALLOR CLENDENING GRODNER
& BOHRER LLP
pomilian@mcgb.com

Eric S. Pavlack
COHEN & MALAD LLP
epavlack@cohenandmalad.com

Bernard  Persky
LABATON SUCHAROW & RUDOFF
LLP
bpersky@labaton.com

Jonathan G. Polak
TAFT STETTINIUS & HOLLISTER
LLP
jpolak@taftlaw.com

Gary P. Price
LEWIS & KAPPES
gprice@lewis-kappes.com

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

John R. Price
JOHN R PRICE & ASSOCIATES
john@johnpricelaw.com

Garrick B. Pursley
SUSMAN GODFREY L.L.P.
gpursley@susmangodfrey.com

Gayle A. Reindl
TAFT STETTINIUS & HOLLISTER
LLP
greindl@taftlaw.com

Mindee Jill Reuben
WEINSTEIN KITCHENOFF & ASHER
LLC
reuben@wka-law.com

Brady J. Rife
MCNEELY STEPHENSON THOPY &
HARROLD
bjrife@msth.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

C. Joseph Russell
BOSE MCKINNEY & EVANS, LLP
crussell@boselaw.com

Hollis L. Salzman
LABATON SUCHAROW & RUDOFF
LLP
hsalzman@labaton.com

L. Kendall  Satterfield
FINKELSTEIN, THOMPSON &
LOUGHRAN
1050 30th Street, N.W.
Washington, DC 20007

Robert S. Schachter
ZWERLING SCHACHTER &
ZWERLING LLP
rschachter@zsz.com

Eric Lee Schleef
U.S. DEPARTMENT OF JUSTICE
eric.schleef@usdoj.gov

Robert J. Schuckit
SCHUCKIT & ASSOCIATES, P.C.
rschuckit@schuckitlaw.com

Frederick William Schultz
GREENE & SCHULTZ
fschultz@kiva.net

John E. Scribner
WEIL, GOTSHAL & MANGES
1300 Eye Street N.W.
Suite 900
Washington, DC 20005

Anthony D. Shapiro
HAGENS BERMAN SOBOL SHAPIRO
LLP
tony@hbsslaw.com

Melinda R. Shapiro
BOSE MCKINNEY & EVANS, LLP
mshapiro@boselaw.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Rohit Kumar Singla
MUNGER TOLLES & OLSON, LLP.
rohit.singla@mto.com

Eugene A. Spector
SPECTOR ROSEMAN KODROFF &
WILLIS P.C.
espector@srkw-law.com

Jennifer  Sprengel
30 North La Salle Street
Suite 3200
Chicago, IL 60602

Edward Price Steegmann
ICE MILLER LLP
ed.steegmann@icemiller.com

Renae D. Steiner
HEINS MILLS & OLSON, P.L.C.
rsteiner@heinsmills.com

Stephen D. Susman
SUSMAN GODFREY LLP
ssusman@susmangodfrey.com

Justin M. Tarshis
ZWERLING SCHACHTER &
ZWERLING LLP
jtarshis@zsz.com

Richard M. Volin
FINKELSTEIN, THOMPSON &
LOUGHRAN
1050 30th Street N.W.
Washington, DC 20007

Frank John Vondrak
UNITED STATES DEPARTMENT OF
JUSTICE
frank.vondrak@usdoj.gov

David Bruce Vornehm
DREWRY SIMMONS PITTS &
VORNEHM
dvornehm@drewrysimmons.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY
rwaicukauski@price-law.com

Lawrence Walner
LAWRENCE WALNER &
ASSOCIATES
walner@walnerclassaction.com

Randall Batchelder Weill
PRETI FLAHERTY BELIVEAU
PACHIOS & HALEY LLP
rweill@preti.com

Stewart M. Weltman
WELTMAN LAW FIRM
sweltman@weltmanlawfirm.com

Joseph R. Whatley Jr.
WHATLEY DRAKE LLC
jwhatley@whatleydrake.com

Matthew Lee White
GRAY & WHITE
mattwhiteatty@aol.com

Joseph N. Williams
PRICE WAICUKAUSKI & RILEY
jwilliams@price-law.com

Judy L. Woods
BOSE MCKINNEY & EVANS, LLP
jwoods@boselaw.com

Robert J. Wozniak Jr.
MUCH SHELIST
191 North Wacker Drive
18th Floor
Chicago, IL 60606

Kendall S. Zylstra
FARUQI & FARUQI, LLP
kzylstra@faruqilaw.com

SCOTT D. HUGHEY
Register No. 08218-0
FCI Terre Haute Satellite Camp
P.O. Box 33
Terre Haute, IN 47808

BATES WHITE, LLC
1300 Eye Street, N.W.
Suite 600 E
Washington, D.C., DC 20005